AUGUSTINE T. BROOKE, Executor of HENRY BROOKE, and others *vs.* MARGARET A. BROOKE.

*Valid marriage—Dower.*

B. just previous to the performance of the marriage ceremony, said to the woman, "I will marry you, but understand I will never live with you." Subsequently B. frequently visited his wife, and was the father of one or more of her children begotten after the marriage. HELD:

That the marriage was valid, and the wife who survived B. her husband, was entitled to dower in his estate.

APPEAL from the Circuit Court for Prince George's County, in Equity.

The case is stated in the following opinion of Judge STONE pronounced in the Court below, and concurred in by Judge FORD:

"This is a bill filed by Margaret A. Brooke, claiming to be the widow of Henry Brooke, deceased, for dower in the real estate left by said Henry Brooke. The defendants in their answers deny the marriage of complainant to Henry Brooke, and the important question for us to decide is, whether such marriage did, in fact, take place. Henry Brooke and the complainant were both residents of the same village, and there is no evidence that he ever lived with her or openly acknowledged her to be his wife, and the burden of proof is, therefore, upon the complainant to establish the fact of the marriage. Her own testimony must be excluded entirely from the case, (35 *Md.*, 381,) and we must look to other testimony in the record to establish that fact, if it is established. The complainant to prove the marriage, produced as a witness Rev. B. F. Wiget, a priest of the Roman Catholic Church, who proved

that on the 29th of February, 1872, in St. Joseph's Church, in the City of Washington, he married, according to the rites of that church, two persons who gave their names as Margaret A. Ridgely and Henry Brooke, and he produced the church record of marriages, where the entry made at the time, and in his own hand-writing, showed that such a marriage did take place. The complainant also produced John O. Day and Paul Rickenbacker, who, with equal distinctness, proved that they were called in to witness, and did witness the marriage ceremony performed by Rev. Mr. Wiget, between two persons who gave their names as Henry Brooke and Margaret A. Ridgely. The character of these witnesses stands unimpeached (to say nothing of the record), and the fact that such a marriage did take place between parties who gave their names as above stated, is most conclusively established. Indeed, we do not understand the respondents to contend very earnestly that no such marriage took place, or that Miss Ridgely was not one of the parties, but they do earnestly insist that Henry Brooke was *not* the bridegroom, but that some other person personated him. We will examine the evidence on that point.

" The law does not presume fraud or falsehood, but truth and honesty, and the burden of proof always rests upon him who charges the fraud or falsehood, to establish it by sufficient proof; when, therefore, on the 29th of February, 1872, the gentleman who was then married, gave his name as Henry Brooke, the Clerk of Prince George's County, it is a presumption of fact that he told the truth, and that it was Henry Brooke, and it rests with those who deny it, to prove that it was not he. While this presumption of truth applies generally, it is particularly strong in a case like the present, when the assertion was made before the altar, in the house of God, and when his minister was about to perform one of the most important of the holy rites of the church. In addition to this presumption,

there is an utter want of any probable motive that could have induced any one to personate Brooke at that marriage. The marriage was not a mock marriage, and the man was legally married, whether he gave his true name or not. It was the person, and not the name, who was married.

"The suggestion that some one married Miss Ridgely in the name of Brooke, for the purpose of getting a share of his estate after his death, would be a most violent presumption. In the first place, Brooke was then comparatively a young man, and likely to live to the ordinary age, and conspirators are not likely to commit a fraud, when it required in all human probability so long a time to reap the fruits of it; and whether they *ever* would reap any, would depend upon a most uncertain contingency—that is, the survival of the wife—for if she died first, the conspiracy would be in vain. This marriage took place nearly ten years ago, but no one has seen or heard of the man— if any there was—who then personated Brooke. No one, as far as this record shows, ever suspected that she was married to any one except Brooke. The defendants, in order to establish the fact that it was not Brooke who married Miss Ridgely, offer in evidence Brooke's declarations that he never was married to her. These declarations are admissible, (*Blackburn vs. Crawford,* 17 *Md.,* 49), and must be weighed and considered. It is abundantly proven that he did repeatedly deny his marriage, and there is no proof that he ever acknowledged it.

"It is also abundantly proven that he did not *openly* cohabit with her, treat her as a wife, or even contribute to her support. If Brooke declined to acknowledge Miss Ridgely as his wife, by openly living with and treating her as such, it could hardly be expected that his declarations would admit what, by his acts, he denied. Had he admitted the marriage, he must at once have taken Miss

Ridgely to his home, and the secret would have been a secret no longer. But the whole evidence in this case points to the fact that this marriage was to be kept secret. He said in the hearing of the priest, Father Wiget, that although he would marry her, he would not live with her. He refused to get a license, and thus put the fact upon the records of the State. He is proved by Sandy Forrest to have left Marlboro' for Washington before day in the morning. All these facts point clearly to an intention to keep the marriage a secret as far as possible. In view of these facts, the unsworn declarations of the party are not entitled to any great weight. Secret marriages are, unfortunately, not of very rare occurrence.

" The different social standing of the parties, the opposition of friends, or the fear of public opinion or ridicule, are some of the causes that induce persons to contract such marriages. When the concealment is once begun, it is very difficult to end it. The same causes continue to operate in many cases, and there is the additional cause brought in by long concealment, that the parties do not like to acknowledge that they have been acting deceptively toward the community in which they live, and thus put off the acknowledgment until death makes it impossible.

" The defendants have also offered in evidence sundry papers, executed after the alleged marriage by complainant, and in which she signs herself Margaret A. Ridgely, and argue, that she would not have done so if Brooke had been her lawful husband, as the papers were given to him. But it must be remembered, that this marriage was kept secret by *both* parties. It is very apparent, that Brooke was the party, who in the first instance desired the secrecy, and that the complainant assented thereto. To keep the secret in good faith, it was necessary for her to keep her maiden name, both in speaking and writing, and her signatures to these papers, only prove that she did what she could, to gratify him in keeping their union from

the public. In most cases of such marriages, it is the man that desires the concealment, and the woman only consents, because he desires it. It is often very hard for her to do so. When the complainant went to the Providence Hospital to be confined, the Sisters deposed that she was often in tears and much distressed. This may be well accounted for, from the fact, that in order to carry out her promise of secrecy, she had to give an assumed name, and at such a time to be among strangers (kind as they were), instead of in the home that was rightfully her's. It would have been idle for Brooke to have denied the marriage, unless she had also agreed to aid him in the denial.

"The will of Brooke is, we think, admissible, but is neither an affirmance nor denial of the marriage, and all it does prove is, that he made no provision for his wife.

" But the testimony in the record, and some of it offered by defendants, we think clearly establishes the fact, that Brooke was the person who was married to Miss Ridgely on the 29th of February, 1872. Mr. Wiget deposes, that when the parties first came to him, he declined to marry them until he had consulted with his Ecclesiastical Superior at Baltimore, and he parted with the man, he (Wiget), to go to Baltimore, and the man to go to Annapolis, where he said he would get a license. It was proved conclusively by the hotel register at Annapolis, as well as by the certificate of Judge MAGRUDER, that he (Brooke) was there on the 28th and 29th, and that he left Annapolis in the afternoon of the 29th, and by the time-table, and hotel register at the National Hotel, that he did arrive *in Washington in time to be married that evening.* Two important facts are thus proven, that is to say, that Henry Brooke *did* what the man who Father Wiget married said he would do, and that Brooke was in Washington on the evening of the marriage, and in time for it. When we consider, that this testimony was offered by defendants, and *after* the testimony of Wiget was taken, it is a strong

circumstance to prove the identity of Brooke with the man that held the interview with Wiget before the marriage.

"Some attempt has been made to impair the value of the testimony of Mr. Wiget, by showing some inaccuracy of memory as to whom he consulted when he went to Baltimore, &c. But the rule is well established, that the value of the testimony of a witness who can speak positively of the main facts in issue in any case, is not impaired or lessened by a mistake of a *collateral fact.* The principal facts in this case, and to which the mind of the witness was directed, was just to get the consent of his Ecclesiastical Superior for him to perform the ceremony, and then to perform it. He did get that consent, and he did perform that marriage, and he speaks in positive terms of these facts. He tells us why he remembers them so well. His sympathies were strongly enlisted by the condition of the lady, soon to become a mother. It made no difference to him who gave him the authority, so that he got it, and his mind was not directed to the person who gave it, but to the authority itself. He might forget whether it was given by Archbishop Spalding or the administrator (one was as competent to give it as the other), without any disparagement to his testimony as to the main facts of the case.

"In addition to the proof of the identity of Brooke heretofore mentioned, the complainant produced before the commissioners in this case, a photograph of Henry Brooke which is admitted to be a genuine photograph, and taken in 1877, and upon an examination of it, the priest who married them, the two witnesses who saw them married, and a Miss Jamieson who saw the couple *about* the time of the marriage, identified the photograph as the picture of the man who was married. Mr. Wiget was not very positive in his identification, but the others spoke confidently on the subject. This evidence, we think, clearly admissible, (76 *Penn. State Reports,* 340,) and not only

admissible, but of the strongest character, and much more reliable than any mere general description that a witness could give.

"The photograph is now in constant use in the detective service, and is found to answer the purpose of identification remarkably well. An expert detective, after examining the photograph of a man he has never seen, can easily pick him out in a crowd. These witnesses had their attention called to Brooke—two of them, because of their being called on to w tness the marriage, and the third, Miss Jamieson, from some circumstances that excited her curiosity; and when they identify the photograph as a picture of the man who was married, we consider their evidence as entitled to great weight, and, in the absence of strong rebutting testimony, conclusive. Upon all the evidence in this case, we are of opinion, that Henry Brooke and Margaret A. Ridgely were legally married on the 29th of Feb. 1872, and that as his lawful widow, she is entitled to dower in his estate.

"The only remaining question for our decision is, of what lands the complainant is dowable? We understood the solicitors of the complainant to abandon claim for dower in the lots bought from Slayman and Hill, which are referred to in the bill. The respondents, however, insist that the deed from Dr. W. W. Waring to Henry Brooke, although absolute on its face, was intended by the parties, as only a security for money due by said Waring, and that therefore, the complainant, even if decided to be the lawful widow of Henry Brooke, would not be entitled to dower therein. In this view of the respondents, we concur.

"The law is very well settled in this State, that a deed absolute on its face, may, and will be treated as a security for money, by a Court of equity, if it be satisfied by sufficient legal proof, that such was the intention of the parties. The difficulty generally lies in the proof, and not in

the law. There has been a great deal of parol evidence brought into this case, which has been excepted to. But in the view we take of the matter, we are relieved from the necessity of passing upon these exceptions, as we think there is enough testimony in the case, outside of the parol proof, that warrants our conclusion.

"In the first place, Brooke in his life-time, never was in possession of the farm, or exercised any acts of ownership over it. He never worked it or rented it out. It was in the possession of Dr. Waring, from the time he, (Waring,) purchased it, up to the institution of this suit, and he appears to have treated and used it as his own. In the second place, it is found that Waring was, and is indebted, to Brooke. That much of the parol evidence that proves the fact of such indebtedness of Waring to Brooke, does not infringe the rule that parol evidence is inadmissible to contradict, add to or vary the terms of a written instrument, and is, therefore, admissible to prove the fact of the indebtedness. But that Waring was in debt to Brooke, is proven by the will of Brooke, produced by the complainant herself, and clearly admissible to prove that fact. In the third place, Brooke, *in his will,* distinctly recognizes Waring's title to this farm, as well as Waring's indebtedness to him. He provides that such indebtedness should remain on the farm, and also provides, that any additional amount that might come to the children of Waring, (who were some of his devisees,) should be secured to them by a security on this farm. Upon a fair construction of that will, we think it was the intention of the testator, that the children of his sister, Mrs. Waring, should take the debt of their father as their share, or rather, that their share should come out of this debt, and if their share should amount to more than this debt, then the additional amount was to be secured on this farm. His object being to make his own children the only creditors (as far as he, Brooke, was concerned) of their father. These facts are entirely in-

consistent with any claim of Brooke to a fee simple in the farm, as he could never have intended to invest his own money in his own land.    But all these facts do point almost demonstratively to the conclusion that the deed was intended as a mortgage.·   We, therefore, decide that the complainant is not entitled to dower in the farm, and that she is entitled to dower in all the real estate mentioned in the bill of complaint, with the exceptions mentioned in this opinion, and we will sign a proper decree in conformity therewith."

In conformity with the foregoing opinion, the Court passed a decree, dated the 27th of February, 1882, adjudging that the complainant was lawfully married on the 29th day of February, 1872, to Henry Brooke, deceased, and as his lawful widow was entitled to dower in certain real estate, particularly mentioned in said decree.   The decree also appointed commissioners to assign and lay off the dower of the complainant.   From this decree the defendants appealed.

The cause was argued before MILLER, ALVEY, ROBINSON, IRVING, and RITCHIE, J.

*Joseph K. Roberts, Jr.,* and *Daniel R. Magruder,* for the appellants.

*C. C. Magruder, Jr.,* and *John P. Poe,* for the appellee.

RITCHIE, J., delivered the opinion of the Court.

The appellants contend, first, that Henry Brooke was not the person to whom the complainant was married; ·secondly, if he was, that the motives and intentions with which he became a party to the marriage rendered it invalid.

That the complainant was united in marriage on the 29th of February, 1872, by the Catholic priest, Father

Wiget, at St. Joseph's Church, in Washington City, to a man professing to be the Henry Brooke of whom complainant now claims to be the widow, is conceded. The fact that the marriage ceremony took place not being disputed, there is left to be determined only the simple question of whether the person who claimed to be Henry Brooke was really him or not.

Upon this question of fact we concur in the conclusion reached by the Court below. The discussion of the evidence by that Court is so clear and ample as to render it unnecessary for us to go in detail over the same ground; and we shall direct its opinion to be incorporated into the report of this case as a sufficient statement of the reasons why we consider the identity of Henry Brooke to have been fully established.

As to the proposition of law contended for by the appellants, that, assuming Henry Brooke to have been the real party to the ceremony of marriage, his having remarked to the complainant just previous to its performance, "I will marry you, but understand, I will never live with you," rendered the marriage ceremony an idle form without binding force, while we would remark we can give no countenance to the idea that the solemn rites of marriage which it is the policy of the law and good morals to uphold, can be thus converted into a delusion and a fraud, there is in this case no foundation even to contend for the doctrine set up, as the evidence shows the facts do not exist to which it could be applicable. Even if Brooke made that declaration with the intention at the time of not treating the complainant as his wife, he nevertheless proceeded to take the vows that declared them man and wife; and the evidence shows that he frequently visited her afterwards, and was the father of one or more of her children begotten after the marriage.

Nor do we deem it material to announce our agreement or dissent as to the opinion of the Court below that the

declarations of Brooke during his life-time that he was not married to complainant were admissible testimony; because, even giving to them their full effect, they are more than counterbalanced by the other testimony in the cause. In fact, his denials of the marriage are entitled to but little weight, as it plainly appears that although he was aware that a public report of his marriage was in circulation so early as 1874, and it was asserted, to his knowledge, that the certificate of the marriage had been seen, he did not abandon his intimate relations with the complainant; and notwithstanding the ceremony took place in Washington City, but a short distance from his home; that the record of it was kept in a well-known church of his own denomination; and the priest who performed the ceremony and the witnesses to it, and the complainant herself, were all readily accessible to him up to the time of his death in 1879, he never approached the priest or the witnesses on the subject, nor took any steps whatever to expose what, if not true, was a most heinous fraud, such as no one upon whom it was practised would continue to labor under, with the amplest facilities at hand to expose it, and not place himself right before his family and the community. To content himself with mere denials, was to shrink from an easy and incumbent investigation, and can only be regarded as in harmony with the conduct of one who had contracted a marriage intended to be kept secret, and which he was unwilling to avow.

As to the point made by the appellants that the decree is general and therefore against A. T. Brooke as executor, although he was improperly made one of the parties defendant to the bill, and was allowed to amend his answer to show that in that capacity he had no interest in the question of the complainant's right of dower, it is unnecessary to say more than that Brooke is not affected by the decree, as executor, and no part even of the costs is awarded against him in that capacity.

Brooke, Ex'r, *et al. vs.* Brooke.

Concurring with the Circuit Court that a valid marriage was solemnized, as the complainant avers in her bill, between her and the said Henry Brooke, and that she accordingly is entitled to have her dower assigned as the Court has awarded it, we shall affirm the decree appealed from. But we think it proper and equitable to grant the application of the appellants, in case their appeal was unsuccessful, that the costs be equally divided between the parties. This we do because the defendants had reasonable ground to question the fact of complainant's marriage to Henry Brooke, from the neglect of complainant to assert it in his life-time, and from her not openly maintaining those relations to him usually subsisting between married persons. As this conduct of the complainant, whatever may have been the extenuating circumstances, furnished reasonable ground for resisting her demands, and she may be regarded as largely responsible for the litigation attendant upon the establishment of her rights, we think it but fair she should equally bear the burden of the costs.

*Decree affirmed, and costs above*
*and below equally divided between*
*the parties; and cause remanded.*

(Decided 6th July, 1883.)