# WALTER T. WIMBROUGH

## *vs.* ·

# SUSIE MAY WIMBROUGH.

*Marriages: setting aside; terror, fraud or duress; jurisdiction of equity.*

The authority of courts of equity to set aside marriages on the ground that they were procured by abduction, terror, fraud or duress, rests upon their general jurisdiction to set aside contracts affected by fraud, etc.                    pp. 621-622

But the courts exercise the power with extreme caution, and only where the allegations of the bill are sustained by clear, distinct and satisfactory evidence.                    p. 622

When ante-nuptial incontinence has taken place the charge of threat or menace unlawful, or fraud or duress, must be fully and satisfactorily established before a court of equity will annul the marriage.                    p. 622

The mere uncorroborated statements of the petitioner are not sufficient, especially when it is denied by all the defendant witnesses.                    pp. 628-629

The statement of a man, that, although he will marry a woman, he will never live with her, is not sufficient to render the marriage ceremony void.                    p. 629

*Decided April 8th, 1915.*

Appeal from the Circuit Court for Worcester County. In Equity. (JONES, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*Geo. M. Upshur* (with whom was *Franklin Upshur* on the brief), for the appellant.

*Wm. F. Johnson,* for the appellee.

Thomas, J., delivered the opinion of the Court.

The bill in this case was filed in the Circuit Court for Worcester County on the 11th of October, 1913, by Walter T. Wimbrough, of that county, the appellant, to annul a marriage between him and the appellee on the ground that it was the result of duress "practiced upon him" by the father of the appellee.

It alleges that on the 19th of March, 1913, "an alleged marriage took place in the town of Berlin, in Worcester County," between the plaintiff and defendant; that the plaintiff "was compelled to go through a marriage ceremony with the defendant only because of duress practiced upon him by John T. Adkins, the father of the defendant, and because of fear of instant death or grievous bodily harm at the hands of the said Adkins by reason of threats then and there made by" him "against" the plaintiff if he "should refuse to go through the marriage ceremony with the defendant"; that he left the defendant at her father's house immediately after the ceremony, which took place there, "and has not since lived," cohabited with, seen or communicated with her in any way, and that the marriage was procured as aforesaid without his consent, "and under his protest, uttered at the time of the performance of the ceremony in the presence and hearing of the defendant," her parents, "and the minister of the Gospel who performed the ceremony."

The answer of the defendant admits that the plaintiff left her at her father's house immediately after the marriage,

and that he has not lived or cohabited with her or seen her since; but it denies that he never consented to the marriage, or that he was compelled to go through the marriage ceremony by duress practiced upon him by her father, or because of fear of death or bodily harm at the hands of her father, or that the marriage was procured by fraud, force or duress, and avers that the marriage license was procured by the plaintiff; that the minister who performed the ceremony was secured by him, and that "he expressed not only his willingness but a desire to marry the defendant, only at the last moment asking that the ceremony be deferred for a day, which the defendant then declined to do." The answer further alleges "that since said marriage a child has been born, the offspring of the plaintiff"; that since the birth of the child on the 5th of July, 1913, the plaintiff has contributed "nothing to its support," or "towards the maintenance of the defendant" since the marriage beyond the sum of sixteen dollars paid her shortly thereafter.

CHANCELLOR BLAND says in *Fornshill* v. *Murray,* 1 Bland, 479, that, "Marriage has been considered among all nations as the most important contract into which individuals can enter, as the parent not the child of civil society," and a reference to some of the authorities bearing upon the important and delicate questions involved, will greatly aid us in the examination of the evidence in the case.

While section 14 of Article 16 of the Code of 1912 provides that the Circuit Courts of the counties and the Superior Court of Baltimore City, upon petition of either of the parties, and the Circuit Courts of the counties and the Criminal Court of Baltimore, on indictment, may inquire into, hear and determine the validity of any marriage, "and may declare any marriage contrary to the table of this article, or any second marriage, the first subsisting, null and void," the authority of courts of equity in this State to determine the validity of a marriage charged to have been procured by abduction, terror, fraud or duress, rests upon their general

jurisdiction to set aside contracts affected by fraud, etc. *Fornshill* v. *Murray, supra; Le Brun* v. *Le Brun,* 55 Md. 496; *Ridgely* v. *Ridgely,* 79 Md. 298.

The caution, however, with which courts exercise this jurisdiction is clearly and forcibly stated in *Le Brun* v. *Le Brun, supra,* where JUDGE MILLER says: "But while the courts are thus clothed with jurisdiction, the peculiar nature of the subject to be dealt with, requires that the power should be exercised with extreme caution, and only where the allegations of the bill are sustained by clear, distinct and satisfactory evidence. This position is sustained by an unbroken current of authority. Marriage has been consid-ered, among all civilized nations, as the most important con-tract into which individuals can enter, as the *parent,* not the *child,* of civil society. The great basis of human society throughout the civilized world is founded on marriages and legitimate offspring; and where an existing marriage is proved, it is not to be exposed to the danger of being set aside by any species of collusion, or by the mere declarations of either of the parties, and should only be brought into question upon the most undisputed proofs." After referring to the presumptions in favor of the validity of a marriage where there is issue, or where it is assailed upon the ground that a former marriage of the woman is still subsisting, he says further: "We can not, therefore, pass a decree in this case which will bastardize the issue and impute crime to the woman, unless the fact that her former husband was alive, at the date of her second marriage, is clearly established by such proof as all of the authorities upon the soundest of rea-sons indicate and require." In the case of *Seyer* v. *Seyer,* 37 N. J. Eq. 210, the VICE-CHANCELLOR said: "And as to this branch of the case, it may be said that when the Court is satisfied that ante-nuptial incontinence has taken place, the charge of threat or menace unlawful, or fraud or duress, must be most fully and satisfactorily established before the Court will annul the marriage." In *Rooney* v. *Rooney,* 54

N. J. Eq. 231, 34 Atl. 682, the CHANCELLOR said: "It is hardly necessary to cite authority for the position that a complainant who comes into court under the circumstances above stated, and asks a decree of nullity, the result of which is to declare one whom he has sworn to love and cherish as a wife to be no more than a concubine, and her offspring, the fruit of the unlawful communion (born pending the suit), a bastard, must prove his case with the utmost strictness. The same rule applies in such a case as on an indictment for bigamy. The Court in such cases is bound to act as the guardian of the helpless infant, and watch his rights and interests with jealous care"; and it is said in 26 *Cyc.* 913: "The burden is on the plaintiff to sustain his material allegations, and in view of the peculiar nature of the contract of marriage and the grave consequences of dissolving it, the courts will not grant a decree except upon the production of clear, satisfactory and convincing evidence. * * * According to the generally accepted rule, such a decree will not be given on the mere admissions or confessions of the parties alone without satisfactory extraneous evidence, or upon the uncorroborated testimony of plaintiff."

In *Todd* v. *Todd,* 149 Pa. St. 60, 17 L. R. A. 320, where the statute of Pennsylvania authorized a divorce where the marriage was procured by fraud, force or coercion, the Court said: "It is not alleged that there was any force used to compel the marriage, and, in order to justify a divorce, under the statute, upon the ground of threats, they must be such threats, against the life or to do bodily harm as would overpower the judgment and coerce the will. There must be such a mental condition as a result of the threats that the libelant did not and could not in reality consent to the marriage," and it is said in 14 *Cyc.* 596, "A divorce will not be decreed on the ground of duress unless it appears that the marriage was contracted under force or threat of bodily harm." Where a man marries to escape arrest or imprisonment for seduction or bastardy he cannot avoid the marriage

on the ground of duress, nor is a marriage induced by threats
of lawful prosecution, arrest or imprisonment, to redress or
punish a wrong open to impeachment on that ground. 1
*Bishop on M. & D.,* sec. 543; 26 *Cyc.* 906; *Sickles* v. *Carson,* 26 N. J. Eq. 440; *Todd* v. *Todd, supra; Collins* v.
*Ryan,* 43 L. R. A. 814, and note; *Ingle* v. *Ingle,* 38 Atl.
Rep. 953; *Frost* v. *Frost,* 6 Atl. Rep. 282; *Scott* v. *Shufeldt,*
5 Paige, 43.

The plaintiff testified that he had several talks with Mr.
Adkins about marrying defendant; that on Monday previous
to the marriage, which took place on Wednesday evening,
Mr. Adkins and his wife came to his father's shop and told
the plaintiff in the presence of his father and his brother that
he had to marry the defendant "else he would die by me";
that "it wasn't need for me to try to get away," for if he
did "they would put an officer on my track"; that he went
around to Mr. Adkin's house that night and they arranged
for Mr. Adkins to get the license the next day and for the
marriage to take place at seven o'clock Wednesday evening;
that the threat Mr. Adkins made on the Monday referred to
was the only threat he made before the evening of the marriage; that he also went to see the defendant Tuesday evening before the marriage. That on Wednesday evening at the
time appointed for the marriage he went to the defendant's
house, and when he knocked on the door Mr. Adkins came
to the door, and that he then told him that he could not decide until the following evening whether or not he would
marry the defendant; that Mr. Adkins called his wife to the
door and told her what the plaintiff had said, and that they
invited him in the house; that Mr. Van Dyke, the minister,
and the defendant were there; that as soon as they got inside of the house Mr. Adkins flew into a rage and told Mr.
Van Dyke that he had refused to marry the defendant, and
said I would "have to marry her" before I went out of the
house; that he, plaintiff, then said that if he had to marry
her he would do it, but that he would not live with her or
support her unless he had to do it; that Mr. Van Dyke did

not want to perform the ceremony under those conditions, but that Mr. Adkins insisted, and that they were married and that he left the house immediately afterwards; that he did not want to marry the defendant and did it to save his life; that as soon as he told Mr. Adkins that night that he would not then marry his daughter he rushed into another room in a fit of passion and got some kind of weapon; that his wife and daughter tried to stop him, and said "don't do that Tom," but he got the weapon and when he came back he said to the plaintiff "you will marry this girl before you leave the house"; that he had his right hand in his coat pocket so that he could shoot right through the pocket, and that he, plaintiff, thought he had a pistol and thought he would kill him, as he was defenseless and had no means of escape. Mr. Wimbrough, the father of the plaintiff, testified that on Sunday previous to the marriage he went to see Mr. Adkins; that they "talked on some matters" in regard to the plaintiff and defendant, and that Mr. Adkins said he could not give him any answer until he talked with his wife, and that he would be around to his shop to see him Monday afternoon; that he and his wife came to the shop and said in the presence of the plaintiff that "he wouldn't make any compromise of any kind" and that the plaintiff "had his daughter to marry;" that if he did not want to live with her he did not have to do so or support her, and said to the plaintiff, "you needn't think you will run off for I will die by you," that he would "put an officer on him."

Mr. Van Dyke states that the first he knew of the matter was when the plaintiff spoke to him as he was passing the shop and told him of the trouble; that the plaintiff said he "gussed he would have to marry the girl," and asked him if he would go around to Mr. Adkins' house Wednesday night, and that he agreed to do so; that on Wednesday afternoon Mr. Adkins brought him the license and asked him if he was coming around and that he said yes; that he went to the house at the hour appointed, and that after a while the plaintiff came, and after some conversation between Mr.

Adkins and the plaintiff on the porch, they came into the house and Mr. Adkins announced that the plaintiff was unwilling to marry the defendant that night; and that when Mrs. Adkins asked why, he said the plaintiff wanted more time, that Mr. Adkins said that he would "do it tonight or not at all, the next move is mine"; that after some further discussion about it the plaintiff said he would not unless he had to, and would not live with her or support her; that Mr. Adkins replied that it did not make any difference whether he lived with her or supported her; that he had kept her ever since she was a baby and could still do so; that he, Mr. Van Dyke, said that he could not marry them under those conditions, and advised them to take more time to consider the matter or to go to a magistrate and have a civil marriage; that Mr. Adkins insisted that the ceremony be performed; that the plaintiff said "if he had to do the thing he could do it but only under those conditions; that he, witness, asked Mr. Adkins if he was willing to have his daughter marry under those conditions and he said he was; that he asked the defendant if she was willing to enter into such an agreement and she said she was; and that he then married them. He was asked if he had heard the testimony of the plaintiff in reference to Mr. Adkins rushing into another room for a weapon, etc., and what he saw and how it appeared to him, and he replied that Mr. Adkins did leave the room and go into another room, followed in a few minutes by his wife and daughter, but that he did not know what they went for; that he did not remember seeing anything in his hand; that Mr. Adkins made no threats of bodily harm in his presence, and that the worst thing, as he sees it, in the proceedings was his statement that "you will do it tonight or not at all, the next move is mine"; that the plaintiff is a member of his church and that he left the house with him immediately after the ceremony.

The testimony of Mr. Adkins, Mrs. Adkins and the defendant, which is very full and explicit, is to the effect that the plaintiff is the father of the defendant's child; that he

promised to marry her, and that when he came to the house
on the evening of the marriage the only reason he assigned
for wanting the marriage postponed for a day was that he
had gotten some information from certain persons and
wanted to see some others about it, but he would not tell them
what it was.    They deny most positively that Mr. Adkins on
the evening of the marriage went into another room and got
a "weapon," or that he made any threats whatever of bodily
harm to the plaintiff.    Mr. Adkins states that he insisted
upon the marriage because the plaintiff was responsible for
the condition of his daughter, and what he meant when he
told the plaintiff that he would "have to" marry her was that
he was the one who had seduced her; that after he saw the
plaintiff and his father at the latter's shop on Monday the
plaintiff came to his house that night; that the next morning
the plaintiff asked him to get the license as the defendant
was not of age and he could not get it; that the plaintiff was
also at his house Tuesday night; that when he came Wednes-
day night he said that he had been talking to some parties
and that he could not marry the defendant that night; that
he asked the plaintiff who he had been talking to but he
would not tell, and that he then said to him that he could
marry her then as well as any other time.    Horace Shockley
testified that he was at Mr. Adkins' house on Tuesday even-
ing before the marriage and that the plaintiff was there; that
he had known the plaintiff for a long time and that they had
always been great friends; that while at Mr. Adkins' house
Tuesday night the contemplated marriage was discussed, and
that afterwards he and the plaintiff went out on the porch
and had a talk in which the plaintiff told him "he guessed he
had got the defendant in trouble and guess he had to marry
her, that he did not see any other way."

The plaintiff was called in rebuttal to state what he re-
ferred to when he told Mr. Adkins Wednesday night that he
had heard something and did not want to marry the defend-
ant that night, and he stated what he had heard.    The mat-
ters related by him were positively denied by the defendant,

are in conflict with the testimony of her father and mother and are not supported by the testimony of either the plaintiff's informant or any of the parties referred to in the information he received.

This evidence, when carefully considered in the light of the authorities we have cited, is hardly sufficient to justify an annulment of the marriage on the ground of duress. The only threat shown by the evidence indicating any intention on the part of the defendant's father to inflict bodily injury, or to justify a fear of bodily harm to the plaintiff is the statement of the plaintiff himself that Mr. Adkins secured a "weapon" which he held in his pocket in such a position that he could shoot him through his pocket. This statement is not supported by the testimony of any of those present, and is not only positively denied by Mr. Adkins, Mrs. Adkins and the defendant, but Mr. Van Dyke, the plaintiff's witness, says that "Mr. Adkins made no threats of bodily harm in his presence," and that, as he regarded it, the worst thing in the whole proceeding was his statement; "you will do it tonight or not at all, the next move is mine." Nothing occurred to indicate that the "next move" referred to was a threat of bodily injury. If there had been, Mr. Van Dyke would certainly have observed it, and could not have testified that Mr. Adkins made no such threat. The statements of Mr. Adkins that if he attempted to run away he would "put an officer on his track," and that he "would die by" him, testified to by the plaintiff's father, or the statement that the "next move" would be his, without something more to show a purpose to inflict bodily harm or injury, would not justify that construction, and there is not a particle of evidence in the case, except the statement of the plaintiff, that he so construed them. They may have expressed a purpose to institute such proceedings against the plaintiff as the law and facts justified, and from all the evidence in the case the plaintiff must have so interpreted them, for notwithstanding his repeated interviews with Mr. Adkins in reference to marrying the defendant, he went to see her Monday night

and Tuesday night, and to his house on the evening of the marriage with apparently no thought of any danger to himself, and certainly without any preparation to repel an attempt to inflict bodily injury. His conduct throughout, as disclosed by all the evidence, which we need not refer to at greater length, is entirely inconsistent with the claim he now makes, and if he married the defendant in obedience to an impelling sense of justice to her, or for the purpose of escaping the penalties of such redress as she or her father were lawfully entitled to, a Court of Equity will not aid him to annul his obligation and cast a stigma·upon his offspring.

The statement of the plaintiff that he would not live with defendant cannot render the marriage void. In *Brooke* v. *Brooke,* 60 Md. 524, the Court said in reference to a similar statement alleged to have been made by the husband: "As to the proposition of law contended for by the appellants, that, assuming Henry Brooke to have been the real party to the ceremony of marriage, his having remarked to the complainant just previous to its performance, 'I will marry you, but understand I will never live with you,' rendered the marriage ceremony an idle form without binding force, while we would remark we can give no countenance to the idea that the solemn rights of marriage which it is the policy of the law and good morals to uphold, can be thus converted into a delusion and a fraud, there is in this case no foundation even to contend for the doctrine set up, as the evidence shows the facts do not exist to which it could be applicable. Even if Brooke made that declaration with the intention at the time of not treating the complainant as his wife, he nevertheless proceeded to take the vows that declared them man and wife."

*Decree affirmed, with costs to the appellee.*