# GEORGE W. OWINGS

*vs.*

# CLARA HELEN BLUM OWINGS.

*Marriage—Procurement by Duress—Ratification—
Evidence.*

In a proceeding to annul plaintiff's marriage with defendant, *held* that it was not brought about forcibly and without his consent, while he was in such a mental state as to be unaware of what was going on, as claimed by him.     pp. 419, 420

A marriage, although voidable by reason of the exercise of duress to bring it about, may be ratified by the cohabitation of the parties after the cessation of duress.     pp. 420, 421

*Decided June 23rd, 1922.*

Appeal from the Circuit Court for Carroll County (THOMAS, C. J.).

Bill by George W. Owings against Clara Helen Blum Owings. From a decree for defendant, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*F. Neal Parke,* with whom was *James A. C. Bond* on the brief, for the appellant.

*Theo. F. Brown,* with whom was *Edward O. Weant* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

In the bill of complaint filed in this case, the appellant asks for annulment of his marriage to the appellee on the ground that he was forcibly and without his consent married to the appellee, and that at the time of the marriage appellant was in such a mental condition that he was entirely unconscious of what was being done and was incapable of entering into a valid marriage contract. These allegations were denied by the answer. It would serve no good purpose to recite in detail the testimony in the case. The preponderance of the testimony tends to show the following facts:

That appellant and appellee became acquainted in December, 1920, while they were employed at Springfield Hospital, he as attendant and she as nurse. She left there about Easter of 1921 and went to her home near Westminster, and he, a little later, got a position as attendant at the Foster Clinic at Catonsville. They became attached to each other, and some time in March; and from that time on, they had illicit intercourse, and she became pregnant early in June, whereupon he promised to marry her and appointed a day in June, but gave some excuse for not keeping this appointment and suggested a postponement until July. On July 22nd, 1922, appellee and her mother went to Catonsville to see appellant, to find out what he was going to do. He requested them to get a marriage license, saying he was busy and could not well leave his work, promising to come to appellee's home to be married at five o'clock on the afternoon of Saturday, July 23rd. He did not come, so the following evening appellee set out with her brother, Peter Blum, and his wife, in his car, to go to appellant's home to find out why he had not kept his appointment. Something happened to the car, so they stopped at Westminster and asked appellee's brothers, Henry and Irvin Blum, who had gone there in the Blum family car, to take them the rest of the way. In passing Mr. Shipley's place they noticed appellant's car in the yard, and correctly surmised that he was calling on Miss Iva Ship-

ley.· Stopping there, Peter Blum knocked at the door and
Miss Shipley answered. He asked for George, and George
went outside with him. There appears to have been quite
a dispute and considerable of .a scrimmage, in the course of
which George declined to go with them to be married, and
ran to his car on the side where there was no door, which,
according to Peter, made him suspect that George was reach-
ing over for his pistol, whereupon Peter drew his and flour-
ished it in the air. Just what happened there it is difficult to
figure out, but all the Blums deny George's story that he
was hit on the head and rendered unconscious, and that he
was taken to Westminster in that condition of mind, and went
through the ceremony oblivious to all that was going on. He
is corroborated only by the testimony of his room-mate,.
Zimmerman, that when he got back to Catonsville he had a
knot on his head as big as a hen egg, and his trousers were
torn and he had no hat. Rev. Mr. Edwards, the Methodist
Protestant Minister at Westminster, who performed the mar-
riage ceremony, testified that he saw nothing unusual about
George; there was nothing about his clothes that indicated
a struggle; that he answered the questions as rationally,
promptly and intelligently as he had ever had people answer
them; that after the ceremony they were leaving the parlor
quietly and George reached in his pocket and pulled out a
five dollar bill, "and placed it in my hand."

There does not seem to be much doubt that at Shipley's
George protested against entering into the marriage state
that night, and that he would have gotten away if some pres-
sure had not accompanied the arguments that were used to
make him see his duty. But when the dispute ended he got
into the boys' car, sat on the back seat with Miss Blum, and
Irvin drove the car with Mrs. Peter Blum beside him. Peter
and Henry went ahead in George's car. Irvin, the only man
besides George in the bridal car, does not seem to have taken
much, if any, part in the dispute before starting. Possibly
he might have been willing to let George out if he had con-

tinued to protest. But it does not appear that there was any unpleasantness or any objection made by George on the way. Again he might have made some effort to escape while Peter was going to look for a minister; or, if there was no chance then, he certainly could have protested when brought in the presence of the minister with only Peter and the two ladies present besides himself.

The cases hold that the duress must exist at the time of the actual ceremony, so as to disable the one interested from acting as a free agent, and protest must be made at that time. See *Lawless* v. *Chamberlain,* 18 Ont. 296, where plaintiff alleged that he was forced into the marriage by intimidation and threats, and it appeared that he at first protested, but that by his subsequent conduct he displayed a readiness to assist in the preliminary and final details, submitted to the proposed method of procedure, and intelligently forwarded its accomplishment. See also *Jackson* v. *Winne,* 7 Wend. (N. Y.) 47; *Schouler's Domestic Relations* (5th ed.), sec. 23 and cases there cited; *Wimbrough* v. *Wimbrough,* 125 Md. 619; 14 *Cyc.* 596. The violence or threats must be of such a character as to inspire a just fear of great bodily harm. 18 *R. C. L.* sec. 38; 43 *L. R. A.* 814; *Wimbrough* v. *Wimbrough, supra.*

The force or duress must be also the directly inducing cause of entering into the marriage, and if a person, although threatened with violence, refuse to enter into the marriage by reason of such threats, and only consents to the marriage after an appeal has been made to his honor, the marriage is valid. 18 *R. C. L.* sec. 38; 9 *L. R. A.* 505; 27 *L. R. A.* (N. S.) 803.

Peter Blum's testimony is that George said, "You can't coax me or drive me, I am as stubborn as a mule, I will go of my own free will."

All of those who were present except George say that he said he was willing to go. George's own testimony shows that he was not afraid of Peter and his brothers, in fact, that

he was able to take care of himself against all of them. He does not claim that he was induced to enter into the marriage by fear of bodily harm, but that at the time of the ceremony he was in such a mental state, resulting from a blow on the head, that he was unconscious of what was going on. As we have said, this contention is practically unsupported. Indeed, by the overwhelming weight of the evidence, he was fully capable of comprehending what he was doing.

In the case of *Seyer* v. *Seyer*, 37 N. J. Eq. 213, the Vice Chancellor said: "It may be said that when the Court is satisfied that ante-nuptial incontinence has taken place, the charge of threat or menace unlawful, or fraud or duress, must be most fully and satisfactorily established before the Court will annul the marriage." (Appellant denies casual knowledge; but he also denies close relations of any sort, or seeks to minimize them, contrary to all the other evidence including his own acknowledged letters). In *Rooney* v. *Rooney*, 54 N. J. Eq. 233, the Chancellor said: "It is hardly necessary to cite authority for the position that a complainant who comes into court under the circumstances above stated, and asks a decree of nullity, the result of which is to declare one whom he has sworn to love and cherish as a wife to be no more than a concubine, and her offspring, the fruit of the unlawful communion (born pending the suit), a bastard, must prove his case with the utmost strictness." The above passages are quoted with approval in *Wimbrough* v. *Wimbrough, supra.* But even if it could be found from the evidence, either that the marriage was contracted, as he contends, while appellant was not in a mental condition to give valid assent to it, or was induced by fear of bodily harm—in neither event would such a finding avail him anything, because voluntary consummation is established by the overwhelming weight of the testimony. That he went with his wife to her home after the ceremony and spent the night with her in her room, is sworn to by six or seven witnesses and contradicted by no one except the appellant, and by the indi-

rect testimony of his room-mate, Zimmerman, that appellant returned to Catonsville at half past three o'clock the morning following the wedding. And there is the explicit testimony of the wife that they had intercourse that night.

A marriage contract which when entered into was voidable merely, may be ratified by the parties by cohabitation as husband and wife after the condition which made it voidable has ceased to exist. This rule has been applied in cases of duress. 18 *R. C. L.* section 78; 27 *L. R. A.* (N. S.) 305, and note; *L. R. A.* 1916 C. 704; *L. R. A.* 1916 C. 706, note; *Tiffany, Dom. Rel.* 10, 14 & 15. Certainly there was no such restraint upon the appellant in this case as to compel him to consummate the marriage. He admits that consciousness returned before they left Westminster. This is entirely different from the case of *Avakian* v. *Avakian,* 69 N. J. Eq. 89, cited by apellant, where the party submitting under duress was a girl fourteen years old.

The principle that application for nullification in case of duress must be made promptly, and before a consummation of the marriage by voluntary cohabitation, is recognized in *Ridgely* v. *Ridgely,* 79 Md. at p. 307.

The application was not made in this present case until after appellant had been indicted for failure to support his wife.

*Decree affirmed, with costs to appellee.*