## SHIRLEY ELIZABETH GORE LURZ *v.* ALBERT WILLIAM LURZ

[No. 25, April Term, 1936.]

*Decided May 19th, 1936.*

The cause was submitted on briefs to BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, J. J.

*Rose S. Zetzer* and *Benjamin L. Freeny,* for the appellant.

*William Sinsky,* for the appellee.

URNER, J., delivered the opinion of the Court.

The bill of complaint in this case alleges that the infant plaintiff, who was eighteen years old when it was filed on September 4th, 1935, became acquainted, at the age of fifteen years, with the defendant, who was then twenty years old, and they had frequent associations, without the knowledge of the plaintiff's parents; that as the result of "solicitation and womanly arts practiced upon him by the defendant," he cohabited with her on numerous occasions; that the plaintiff was then attending school, but the defendant "would continuously seek out the infant plaintiff wherever he might be and practiced her womanly arts upon him"; that the defendant "became pregnant with child," which was born on or about July 10th, 1935; that during her pregnancy the defendant "threatened and coerced by deceit and fraud the infant plaintiff so that on or about November 20th, 1934, the said infant plaintiff went with the defendant to Ellicott City," where she suggested that "he wait outside of a building in said city as he looked too young to have a marriage license issued to him (she went in and obtained the license by perjured testimony)"; that "the license was procured by the defendant with her own money, she having previously purchased a wedding ring on the installment plan on her own account"; that "the infant plaintiff was in great fear and lacked complete understanding of the ceremony to be performed"; that the defendant and the infant plain-

tiff "then went to a minister in said city," where they "went through some form of ceremony which the complainant now understands and believes to have been the usual marriage ceremony"; that he then returned to reside with his parents, and the defendant to reside with her sister-in-law, in Baltimore City; that "prior to going to Ellicott City the defendant threatened to send the infant plaintiff to jail, and is still threatening to send him to jail in the event he should fail to support said infant child," "even though there is some doubt in the mind of the infant plaintiff as to the parenthood of said child"; that "all of these things were done without the knowledge and consent of the infant plaintiff's parents"; that on or about August 29th, 1935, the sister-in-law of the defendant visited the parents of the plaintiff and informed them of the marriage ceremony between the plaintiff and the defendant; "whereupon the infant plaintiff disclosed to his parents the purported ceremony"; that the "infant plaintiff had neither the desire nor the intention of becoming wedded to the respondent nor has he any such desire or intention now, but by coercion and threats practiced upon him by the defendant, he was forced to go through such a ceremony."

The primary purpose of the bill, which was filed by the infant plaintiff through his father as his next friend, is to have his marriage to the defendant annulled. It is further proposed by the bill that the infant child therein mentioned be placed, and maintained by the plaintiff, in a home selected by the court.

The appeal is from an order overruling a demurrer to the bill and directing the defendant to file her answer within thirty days.

In our opinion the allegations of the bill are sufficient to require an answer. For the purposes of the demurrer it is conceded in effect that the youthful plaintiff was induced by the adult defendant to have sexual relations with her frequently, and was fraudulently forced, when he was only seventeen years old, to marry her under threat of criminal prosecution and imprisonment on ac-

count of her pregnancy, and by the use of a license procured by her perjury, and that they have lived separately since the marriage. It was not necessary for the bill to describe the particular "arts" by which the alleged seduction of a schoolboy by a woman five years his senior was accomplished. The averment as to her threat of sending the plaintiff to jail, which could not have been enforced at the time of the marriage (*Allen v. State*, 128 Md. 265, 97 A. 362; Code art. 12, as amended by Laws 1927, ch. 458), was sufficiently definite to apprise the defendant as to the ground of the alleged fraudulent coercion. In *Corder v. Corder*, 141 Md. 114, 117 A. 119, a marriage between the plaintiff, a sixteen year old girl, and the defendant, her father's chauffeur, was annulled upon evidence that it was induced by the defendant's false assurances as to his moral character, that it was solemnized in pursuance of a license obtained by his perjury, that it was contracted without the consent of the plaintiff's parents, and that it was not followed by cohabitation. While the prenuptial incontinence admitted by the bill in this case, and the ensuing birth of a child, may add to the burden resting upon the plaintiff to prove convincingly that the marriage occurred under circumstances which would justify a decree for its annulment (*Wimbrough v. Wimbrough*, 125 Md. 619, 94 A. 168; *Owings v. Owings*, 141 Md. 416, 118 A. 858), we think the order overruling the demurrer, and contemplating a trial of the case on its merits, should be affirmed.

The defense of laches raised by the demurrer is not sustainable as against the allegations of the bill of complaint.

> *Order affirmed, with costs, and cause remanded for further proceedings.*

BOND, C. J., filed a memorandum as follows:

It seems to me the objections raised go rather to the difficulty of proving such facts as are alleged. The burden of proof is a heavy one. *Samuelson v. Samuelson*, 155 Md. 639, 142 A. 97. But taking the allegations at their

face value, they seem to me sufficient to entitle the plaintiff to produce his proof.

OFFUTT, J., filed a dissenting opinion as follows:

With some reluctance I feel constrained to differ from the views expressed by a majority of the court in this case.

The case is this: Albert William Lurz, eighteen years of age, by William J. Lurz, his father and next friend, filed his bill of complaint in the Circuit Court of Baltimore City against Shirley Elizabeth Gore Lurz, his wife, in which he prayed "(A) That the contract of marriage entered into by the complainant and the respondent as aforesaid, be annulled and set aside. (B) That the said infant child be placed in a home selected by this honorable court so that the complainant can maintain the said infant child at said home."

In that bill these facts are alleged: Albert resides with his mother and father at 2727 West Mosher Street in the City of Baltimore, the defendant, twenty-three years of age, resides with her sister-in-law, in that city. The plaintiff, Albert, met the defendant, Shirley, when he was fifteen years old and he "did on numerous occasions go out with the said defendant unknown to his parents" and he did "by solicitation and womanly arts practiced upon him by the defendant" cohabit with her on numerous occasions. At that time he was attending school and the defendant would continuously "seek out" Albert "whereever he might be and practiced her womanly arts upon him." The defendant became pregnant and a child was born on July 10th, 1935. Prior to that the defendant "threatened and coerced by deceit and fraud" Albert, so that on or about November 20th, 1934, he went with her to Ellicott City where she suggested to him that he wait outside of a building in said city "as he looked too young to have a marriage license issued to him," and she obtained the license by perjured testimony, paid for it, and also bought a wedding ring on the installment plan. It is further alleged that Albert was in "great fear and lacked

complete understanding of the ceremony to be performed." The two then went to a minister in said city, where they went through "some form of ceremony" which Albert "now understands and believes to be the usual marriage ceremony." Thereafter they returned to Baltimore, Albert to reside with his parents, the defendant with her sister-in-law. Prior to going to Ellicott City the defendant threatened to send the "infant plaintiff" to jail, and is still threatening to send him to jail unless he supports the infant child. These things were done without the knowledge of his parents and "there is some doubt in the mind of the infant plaintiff as to the parenthood of said child." On August 29th, 1935, the sister-in-law of the said defendant informed Albert's parents of the marriage, whereupon Albert himself "disclosed to his parents the purported marriage ceremony." The bill further states: That Albert "had neither the desire nor the intention of becoming wedded to the respondent nor has he any such desire or intention now, but by coercion and threats practiced upon him by the said defendant, he was forced to go through such a ceremony." The complainant then prays the court "to pass an order placing the said infant child in a home so that he can maintain" it "at the place selected" by the court.

From these facts, conceded by the demurrer, it appears that for some three years before this suit Albert W. Lurz, the plaintiff, had maintained illicit relations with the defendant and that as a result of these relations a child was born on July 10th, 1935. Lurz had no intention of marrying the defendant at any time and was only induced to go through the ceremony by her statement that unless he supported the child she would send him to jail. There are general allegations of fraud based, if upon anything, upon the threat. He concealed his relations with the defendant from his parents until the defendant's sister-in-law had first informed them of his marriage. In the meantime he himself had taken no steps to annul the marriage, and it was only after that disclosure that this suit was brought by him through his father as next

friend. He in substance not only admitted the paternity of the child, but claims its custody and asks the court to have it placed "in a home so that he can maintain" it at a place selected by the court.

The bill therefore makes out this extraordinary case, that the father of the child, born in wedlock, asks the court to have it declared illegitimate, but nevertheless remain in his custody, and the marriage with its mother annulled. As a ground for that singular request he alleges first that he was in effect seduced by "womanly arts" practiced upon him by the defendant; second, that he was coerced into the marriage by the threat that unless he supported the child he would be sent to jail; and, third, that he did not completely understand the "ceremony" to be performed although he now believes it was a marriage ceremony.

There is no allegation that during the period of his illicit relationship with the defendant or at the time of the marriage ceremony Albert was mentally deficient or intoxicated, under the influence of drugs, or otherwise deprived of his understanding. His statement that he did not understand what the ceremony was is wholly inconsistent with his statement that he was induced to go through it by threats of imprisonment. If he agreed to the marriage to escape that consequence he must have understood what it was he was to do. There is not the slightest suggestion that he was at any time under any physical compulsion. He appears to have gone voluntarily from Baltimore City to Ellicott City, where the ceremony was performed. At any time during the relationship he could have informed his parents of his situation. Not only did he not do that, but there is not the slightest suggestion that at any time he repulsed or discouraged the alleged advances of the defendant.

Nor is there anything of substance in the charges of fraud. The only concrete facts alleged to support those charges are that defendant threatened to send him to jail unless he supported the child. Assuming his paternity, which he in substance concedes, that followed as a conse-

quence of article 12 of the Code, as amended by Laws 1927, c. 458. It is suggested in the majority opinion that *Allen v. State*, 128 Md. 265, 97 A. 362, decides to the contrary. What that case decided was that there could be no indictment until after the illegitimate child was born. But the threat alleged in this case was to send Albert to jail unless he supported the expected child. Naturally he could not support the child until after it was born, so that her statement was in entire accord with the statutory law of this state.

The excuse that he was seduced by the "womanly arts" of the defendant has been in constant use since Eve offered Adam the apple, and is quite threadbare.

Whether Albert, in waiting for nearly a year before bringing this suit, was not guilty of laches, was dismissed in the majority opinion in a word or two and without comment. Of course the diligence of Albert's parents cannot be used by Albert as an excuse for his lack of diligence, and that long wait and acquiescence on his part in the ceremony is, in my judgment, entitled to consideration.

The case of *Corder v. Corder*, 141 Md. 114, 117, 117 A. 119, cited in support of the opinion, seems hardly in point. In that case there was no possible doubt that the marriage, which was not consummated, was procured by a particular vicious and indefensible fraud. That leaves as the only possible ground for the relief sought the differences in the ages of the parties to the marriage. At the time the marriage ceremony was performed Albert was seventeen and the defendant twenty-two, according to the allegations of the bill. While under the laws of this state a license may be issued for the marriage of a male under the age of twenty-one years only with the consent of his parents (Code, art. 62, sec. 7), the obtention of such a license through false representation as to the age of the parties does not in itself affect the validity of a marriage performed under the authority of the license. 38 *Corpus Juris* 1283, 1305, *et seq.*

Nor is the plaintiff, Albert, in a position to complain

that the misrepresentation was a fraud upon him, because he was a party to it and went through the ceremony after he had been informed that he appeared too young to have a license issued to him.

No case is cited to support the conclusion that these facts are sufficient to permit the annulment of a marriage as void *ab initio*, other than the case of *Corder v. Corder*, *supra*, which appears to be quite irrelevant to the question. There are cases, however, to the contrary.

Notwithstanding the steady progress of divorce, the marriage ceremony is still held in high respect as the basis of our system of civilization, and should not be lightly regarded nor should its bond be lightly dissolved. While the indignation of the parents of a boy of the age of the plaintiff in this case who had contracted an illicit liaison with a woman several years his senior is understandable, nevertheless it should not be permitted to disturb settled legal principles. 38 *C. J.* 1283, *et seq.* "However unwise and undesirable child marriages may be, the true policy, consonant with good public morals and the best interests of the state, the parties and their offspring, is to preserve such unions when once made, declare their offspring legitimate, the marriage valid. Such policy is one of necessity; otherwise the validity of the marriage would always be open to attack." *2 Nelson on Divorce and Separation*, p. 654. It is applied in this case in favor of the male, but certainly the fact that the husband is older than his wife has not heretofore been regarded as in itself a sufficient ground for the annulment by him of a marriage contracted when his wife was under age, and he was of full age.

In *People v. Slack*, 15 Mich. 193, the question before the court was whether a man who, being of full age, had married one Electa A. Ogden, then under the age of sixteen years, and who subsequently left her and married another woman, was guilty of bigamy. The statute in force in Michigan fixed the age of legal consent in females at sixteen years and also provided that, in case of a marriage solemnized when either of the parties was under

the age of legal consent, if they separated during such nonage and did not afterwards cohabit, the marriage should be deemed void without legal process. In connection with the charge given by the trial court, the Supreme Court of Michigan, in an opinion by Judge Cooley, said:

"It is insisted by the defendant that, under the statute quoted, either party is at liberty to annul the marriage at any time before the one under the age of legal consent shall attain it, and that either is then at liberty to marry again. I do not think this is the law under our statute.

"At the common law, it was undoubtedly the rule that the right to annul the marriage continued with one party as long as it did with the other.—*Reeves Dom. Rel.*, p. 200. But as this subject is fully covered by statutory provisions in this state, we have only to see whether those provisions have introduced any change in this particular. That they were intended to do so, seems to me very clear.

"If we look no further than the statute above quoted, it is difficult, I think, to avoid the conclusion that the separation spoken of is something other than the abandonment by the party over age of the person who is within the age of consent, and who will usually be induced to enter into the marriage by the arts and solicitations of the other. There are so many and so powerful reasons against a rule which leaves females who have reached the age of puberty, but are not yet sixteen, at the mercy of the wiles of designing men, who, after enticing them into a marriage with all the solemnities of the law, may then desert and abandon them with impunity, that we are not disposed lightly to conclude that it was designed to adopt it as a statutory rule. And I do not think apt words are employed for the purpose, if such was the intent. Where a man competent to contract marriage enters into the relation with one who lacks the capacity to give binding assent, and after a brief cohabitation, against her will abandons her, the act is not properly a separation, but a desertion; and the latter is the proper term to apply to it. And as such a desertion would commonly be a great wrong

to the female, and shock the moral sense of the community, we should naturally look in the statute for penal provisions, rather than for those which would not only exempt the wrong doer from any punishment, but allow him with like impunity to repeat the process elsewhere so often as he may find a confiding female who will yield to the proposals he makes, accompanied as they are with all the appearance and form of honesty and honor. For the marriage being only voidable, and not absolutely void, all the consequences of a legal marriage flow from it until it is avoided; it could not be punished as seduction, nor has any statute in any way attempted to make it criminal. I do not think this section can fairly be held to protect such a desertion; but, on the contrary, that it refers only to the separations which are brought about by the mutual consent of both, or by the refusal of the party under legal age to assent to further cohabitation."

While the court there was dealing with a statute, the statute did not in itself state the principle announced in the part of the opinion quoted. The conclusions there stated, however, are consistent with the trend of modern authority, as indicated in cases collected in notes to the text in the volume of *Corpus Juris* cited above.

The proposition that the admitted father of the child can annul his marriage to the mother on the ground that he was induced to marry her by the threat that she would do what the law permitted her to do or by any such suggestion as that he did not clearly understand the ceremony seems too flimsy to call for judicial action.

There is no suggestion in the bill that either party at any time disaffirmed the marriage, so that question is not presented, nor is it considered in the opinion, but the bill rests upon the theory that the marriage, having been procured by fraud and duress, was void *ab initio*. Yet as the allegations of the bill are in my opinion not sufficient to permit relief upon that ground, the only possible ground for an annulment of the marriage would be the nonage of the complainant, Albert, which would make the mar-

riage not void, but voidable (*Harrison v. State,* 22 Md. 468, 485, *et seq.;* 18 *R. C. L.* 440; 38 *C. J.* 1283; *Browning v. Browning,* 89 Kan. 98, 130 P. 852), and, until judicially annulled, a valid marriage (*Id.*), with the result that offspring born to the parties during the continuance of the relation would be regarded as legitimate. *Harrison v. State, supra; Dimpfel v. Wilson,* 107 Md. 329, 68 A. 561; 7 *C. J.* 740, Article *"Bastards,"* secs. 4 and 5; *Hunt v. Hunt,* 23 Okl. 490, 100 P. 541; 3 *R. C. L.* 722.

PARKE, J., also dissents.