HENRY LE BRUN *vs.* JULIA H. LE BRUN, by her next friend, JOHN T. RANDALL.

*Powers of a Court of Equity to declare a Marriage a Nullity—
Art. 60, sec. 8, of the Code—1864, ch. 106—Presumption in
favor of the Validity of a Marriage de facto—Proof
required in a proceeding to have a Second Marriage declared
a Nullity, the First Subsisting.*

A Court of equity is empowered to declare a marriage, procured by
abduction, terror, fraud or duress, a nullity, by virtue of its general
jurisdiction in matters of fraud affecting contracts. By Art. 60,
sec. 8, of the Code, a Court of equity is authorized to declare a
marriage null and void, where it is within the prohibited degrees
of kindred or affinity, or where there is a first marriage subsisting
at the time of the second. In such cases, the parties themselves
are made competent witnesses, by the Act of 1864, ch. 109.

Where a marriage *de facto* is followed by cohabitation and issue, there is
not only the ordinary presumption in favor of its validity, but,
being assailed upon the ground that a former marriage of the woman
is still subsisting, the crime of bigamy on her part is involved in
the charge, and the law always presumes against the commission of
crime and in favor of innocence. No decree can be passed in such
a case, unless the fact that the former husband was alive at the
date of the second marriage, is clearly established by such proof
as all the authorities, upon the soundest reasons, indicate and
require.

It would be an alarming doctrine to hold that an actual ceremonial
marriage could be made void by the mere confession or declaration
of one of the parties to it, that she had another husband living at
the time; especially in a case where the fact that the first husband
was alive at the date of the ceremonial marriage, if true, could by
the use of proper and reasonable diligence be established by direct
and conclusive proof.

The testimony of a witness on behalf of a second husband, in a pro-
ceeding by him to have the ceremonial of marriage with the
woman declared a nullity, as to a letter, not produced in evidence

and not proven to have been lost or destroyed, or its absence otherwise satisfactorily accounted for, purporting to be from the first husband, received by the witness in answer to one written by him after the second marriage, was properly excluded; as was also a letter purporting to be from the first husband, addressed to his daughter, after the second marriage, the genuineness and authenticity of which letter, and the identity of the person who dictated it with the first husband, (who could not write,) not being established.

APPEAL from the Circuit Court for Baltimore County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY and IRVING, J.

*George Hawkins Williams*, for the appellant.

In a suit to declare a marriage a nullity by reason that one of the parties at the time of the second ceremonial had been previously legally married, and the marriage not dissolved by death or operation of law, though such a sentence is not necessary, declaratory only that a void thing is absolutely void, yet it is a duty which the Court owes the public so to declare the situation of the parties. *Shelford on Marriage, marg. p.* 565; *Hayes vs. Watts,* 3 *Phill. R.,* 44.

And such interest of the public is greater in cases of absolutely void marriages than in those only voidable; and the sentence of the Court in such cases is not discretionary on its part, but obligatory. 3 *Phillimore R.,* 161; *Pertries vs. Tondeau,* 1 *Hagg. Cons. R.,* 137, 138.

And such sentences, touching the validity of a marriage, never become final judgments, and are always open to revision and reversal; and from their very nature there can be, as to them, no such thing as *res adjudicata,* and are

always impeachable for fraud. *Poynter on Marriage, marg. p.* 157; *Shelford on Marriage, marg. p.* 474; *Duchess of Kingston's Case,* 20 *Howell St. Trials.*

Here a Court had decreed a divorce *a mensa et thoro.* If no marriage and a void ceremonial, such a decree was a farce. The knowledge in such case is never equal; the woman here, absolutely knew—the man had heard and suspected; gossip averred it, but he was unable to prove it—he broke down on his cross-bill. Subsequently he became able to prove. Is he then to be told, it is *res adjudicata,* by the woman who perpetrated the fraud, and did know?

Is a Court to let a decree stand, that by authority, and the very reason of the matter should be always open? And is a man to be deemed married only by the operation of a decree of divorce *a mensa et thoro,* a partial dissolution only of the myth, in the face of overwhelming proof that he never in fact was married at all? To sustain the order of the Court below, the appellee is constrained to argue in behalf of so untenable a position, and that as to the very Court in which the fraud was perpetrated, not being impeached collaterally, but by a direct proceeding in the Court itself which passed the decree.

If this be not the true view, then a man can be validly married to a culprit bigamist, full of guilty knowledge on her part, by the doctrine of estoppel, under the pretext of its being *res adjudicata.*

*Rufus W. Applegarth,* for the appellee.

In considering this case it is important to bear in mind that the appellant, in order to succeed, must negative the presumption of law, that, after an absence of seven years unheard from, the first husband is dead. *Tilly vs. Tilly,* 2 *Bl.,* 444; 2 *Best on Evidence, sec.* 409.

And negative also the further presumption of law in favor of the validity of the second marriage. *Piers vs. Piers,* 2 *H. of L. Cases,* 380.

Le Brun *vs.* Le Brun.

Courts do not annul marriages and bastardize innocent children upon the admissions of defendant, nor of both the parties. *Montgomery vs. Montgomery,* 3 *Barbour Ch. R.,* 134; *Cope vs. Cope,* 1*st M. & Robb,* 269; 1 *Q. B.,* 450, 452; *L. R.,* 10 *Eq.,* 41; 33 *Law Library,* 230.

It has been held by an unbroken line of decisions that in suits of this character it is a clear rule, that strict proof of the identity of the parties is requisite, and that the identity must be proved by other testimony than that of the parties themselves, that is, by witnesses who can speak to the facts from their own personal knowledge. *Page's Law of Divorce,* 86; *Shelford on M. & Divorce,* 33 *Law Library; Searle vs. Price,* 2 *Haggard,* 524; *Legge vs. Legge,* 9 *Jurist,* 144; *Bayard vs. Morphen,* 2 *Philli. R.,* 321; *Williams vs. Williams,* 2 *Haggard,* 418.

To sustain the bill, it was necessary to prove the existence of Randall at the time of the second marriage. *Piers vs. Piers,* 2 *H. of L. Cases,* 380; *Morris vs. Davis,* 5 *Clark & Fin.,* 265; *Rex vs. Twyning,* 2 *B. & Ald.,* 386.

The cross-bill of appellant having been dismissed, in 1874, and a final decree divorcing the parties *a mensa et thoro* having been passed, he cannot be heard in this case to deny the validity of the marriage. The grantee in the deed sought to be annulled should have been made a party. *Chesapeake and Ohio Canal Co. vs. Gittings,* 26 *Md.,* 276; *Jenkins & Hewes vs. Hay,* 28 *Md.,* 547; *Ward vs. Hollins,* 14 *Md.,* 158.

MILLER, J., delivered the opinion of the Court.

The bill in this case filed in February, 1879, prays that a ceremonial of marriage between the parties may be declared and adjudged a nullity, upon the ground that the defendant was the lawful wife of another man who was living at the time this ceremony was performed. It charges, in substance, that on or about the 7th of March, 1849, the said Julia was lawfully married to Charles

Randall, a Prussian, as complainant believes, but then a resident of Baltimore City; that after living together for several years, as man and wife, Randall abandoned her and left the city for parts unknown to complainant; that subsequently, on the 25th of April, 1866, the said Julia, professing to be a single woman, without disclosing to him that Randall was, to her knowledge, then living, went through the ceremonial of a marriage with complainant; that at the time she not only knew that Randall was alive, but subsequent to the ceremony and without complainant's knowledge, she corresponded with him, and received from him letters and money; that in such ignorance, complainant, for some years, continued to live with her as her husband, and during this period she bore two children of whom he is the reputed father; that some years since she left his house and they have ever since lived apart; that still professing to be his wife, she filed a bill for divorce *a mensa et thoro* and for alimony, on which, in November, 1874, a decree for such divorce was passed, and by a subsequent decree complainant was directed to execute a deed of certain property to a trustee, to secure to her, during her life, the annual payment of $183.50 as alimony, which he did, and by common consent another deed, as a substitute therefor, was executed in November, 1875; that throughout all these proceedings complainant well supposed she was his lawful wife, and, as such, entitled to the alimony provided by the deed, but he charges that during all this time she well knew that her true and lawful husband was living, and continued to receive letters and remittances from him long after her pretended marriage with complainant, of all which she studiously kept him in total ignorance. He further charges that such acts and conduct on her part were a deliberate fraud upon his rights, and the application for such divorce, a perversion and mockery of a Court of justice, and the decree, and the deeds executed thereunder,

are as much nullities as the ceremonial of marriage, and should be so declared; that said Randall, so far as known, has never returned to this State since the abandonment of his wife, and complainant is not able to say whether he is now living or dead, but not having been heard from for a long time, he charges that he is now dead.

In her answer the respondent admits her marriage with the complainant in April, 1866, that they have two children, one of whom is now twelve, and the other seven years of age, and avers that in consequence of his cruel treatment she was forced to leave him, and shortly thereafter, in August, 1874, filed a bill for a divorce *a mensa et thoro*, on the ground of his cruel treatment: that he answered that bill under oath, and alleged as a defence thereto, that her former husband, Charles Randall, was still alive, that she had corresponded with and received money from him, that his marriage with her was null and void, and subsequently filed a cross-bill in the same cause, praying to have the marriage annulled upon the same grounds alleged in his present bill; that in that cause a decree was passed on the 2nd of November, 1874, granting the divorce prayed, dismissing the cross-bill and granting alimony as stated, that he executed the deeds referred to, providing for her alimony, and as late as January, 1877, she united with him in a deed conveying part of his property; that in all these proceedings he voluntarily acknowledged her as his lawful wife, and she avers that by the decree in the former case dismissing his cross-bill, and by the execution of the deeds referred to, he is precluded from coming again into a Court of equity, seeking the same relief upon the same grounds. She admits that in March, 1849, she married Charles Randall, and lived with him as his wife until October, 1856, when she avers he abandoned her and shipped as a seaman on board a vessel bound for Liverpool, and since that time she has never seen or heard from him; that at the time of her

marriage with complainant she had neither heard from, or seen her former husband for over nine years, and had every reason to presume him dead, and she therefore avers that he was dead; that before her marriage with him she informed complainant of all these facts, and at the time of the marriage he had full knowledge of them.    She further avers that Charles Randall was illiterate and could not read manuscript or write; that in 1862 or 1863, during the late civil war, a man of his name was reported killed on a United States' gunboat on the Mississippi river, whom she believed to be her former husband.    She denies that after her marriage with complainant she corresponded with, or received either letters or money from Randall, either with or without complainant's knowledge, and she denies *in toto* every allegation of the bill to that effect. She denies that she ever knew that Randall was alive after he abandoned her, or that she in any way so acted as to perpetrate a fraud on the rights of the complainant, and avers that he is her true and lawful husband; that the provisions made for her in the trust deeds are barely sufficient for her support, coupled with the scant proceeds of her daily labor, rendered necessary by his cruel treatment, compelling her to live apart from him, and ought in all good conscience to be upheld, otherwise she will be left to perish in her declining years and weak health.

After general replication to the answer, testimony was taken directed mainly to the question whether the first husband was alive at the date of the second marriage.

Before considering the testimony it is well to notice the source of authority, and the principles upon which the Courts proceed in such cases.    Suits for nullity of marriage have been very rare in this State, but the power of a Court of equity to declare a marriage null and void, when a proper case is made out, cannot be questioned.    The authority of the Court, however, to act in such cases, is not derived from the powers conferred by the divorce laws, although a

Le Brun *vs.* Le Brun.

divorce *a vinculo* may be decreed upon some of the same grounds upon which a marriage may be declared a nullity. *Code, Art.* 16, *sec.* 25. If the marriage be procured by abduction, terror, fraud, or duress, the Court, in declaring it a nullity, acts in virtue of its general jurisdiction in matters of fraud affecting contracts, and by the marriage Act, *(Code, Art.* 60, *sec.* 8,) express authority is given to the Courts to inquire into, hear and determine the validity of any marriage, and may declare any marriage within the prohibited degrees of kindred or affinity, "or any second marriage, the first subsisting," null and void. These are the two sources of jurisdiction, and if in the present case it be derived from either, it is plain the parties themselves are made competent witnesses by the Evidence Act of 1864, ch. 109. Such was the judgment of this Court in the unreported case of *Hoffman vs. Lorenz,* decided in June, 1873, (38 *Md.,* xi.) But while the Courts are thus clothed with jurisdiction, the peculiar nature of the subject to be dealt with, requires that the power should be exercised with extreme caution, and only where the allegations of the bill are sustained by clear, distinct and satisfactory evidence. This position is sustained by an unbroken current of authority. Marriage has been considered, among all civilized nations, as the most important contract into which individuals can enter, as the *parent,* not the *child* of civil society. The great basis of human society throughout the civilized world, is founded on marriages and legitimate offspring ; and where an existing marriage is proved, it is not to be exposed to the danger of being set aside by any species of collusion, or by the mere declarations of either of the parties, and should only be brought in question upon the most undisputed proofs. *Shelford on Marriage and Divorce,* 573 ; *Fornshill vs. Murray,* 1 *Bland,* 481 ; *Piers vs. Piers,* 2 *House of Lords Cases,* 331 ; *Gaines vs. Relf,* 12 *How.,* 472. Where, as in the present case, a marriage *de facto* is fol-

lowed by cohabitation and issue, there is not only the ordinary presumption in favor of its validity, but, being assailed upon the ground that a former marriage of the woman is still subsisting, the crime of bigamy on her part is involved in the charge, and the law always presumes against the commission of crime and in favor of innocence, *Jones vs. Jones*, 48 *Md.*, 391; *Rex vs. Twyning*, 2 *Barn. & Ald.*, 386. We cannot, therefore, pass a decree in this case, which will bastardize the issue and impute crime to the woman, unless the fact that her former husband was alive, at the date of her second marriage, is clearly established by such proof as all the authorities upon the soundest of reasons, indicate and require.

How then stands the proof in the record upon this question? The first marriage was in March, 1849, and the second in April, 1866, as stated in the bill and answer. There was, therefore, an interval of seventeen years between the two, and this is followed by the lapse of nearly thirteen years before the present bill was filed. It is also proved that the woman had issue, who are still living, by each husband. At the time of her marriage to Randall, he was a common sailor, and neither of them could write or read writing. While they lived together, and before he deserted her, he made several voyages, returning regularly to his home and family in Baltimore. During his absence on these voyages, there was a correspondence between them, the letters being written and read by friends or third parties. After this had continued for some seven years, she testifies that in October, 1856, he shipped as a seaman before the mast, on a vessel belonging to Boston, bound to Liverpool, that in February, 1857, she received a letter from him from Liverpool, containing a remittance of $20, and since that time she has never seen him or heard from him. It is proved he never afterwards returned to Baltimore or to the State, and no witness who knew him, and could identify him, proves that he ever

saw him for a long time before, or ever after the date of the second marriage. In fact no witness proves he ever saw him after he left Baltimore in the fall of 1856, and no attempt has been made, even with the assistance of the letter of the 13th of April, 1874, (which will be presently noticed more particularly,) to trace him from 1856 onwards, or to obtain from him, if he was then alive, information which he could readily have given, establishing beyond dispute his identity as the living husband of the appellee. The absence of such testimony, if not fatal to the complainant's case, has a most important bearing upon it. In *Shelford on Marriage and Divorce*, 230, it is said, " In a suit for nullity of marriage, by reason of a former marriage, strict proof of the identity of the parties is requisite. It is a clear rule that the identity must be proved by other testimony than that of the parties themselves, that is, by witnesses who can speak to the facts from their own personal knowledge." The witness, *Mrs. Ashcroft*, who appears to have read the letters, and conducted the correspondence on the part of the appellee with Randall, testifies to the effect that such letters were received and answered after respondent's marriage with Le Brun, and that she admitted she knew that Randall was then alive. Her testimony, as well as that of all the witnesses, we have examined very carefully, and all the comment that need be made upon it, is, that some important discrepancies have been brought out on cross-examination, and most of this correspondence is shown to have taken place long prior to April, 1866, if not prior to February, 1857. The memorandum made by *Mr. Boarman*, as to what the appellee said in his office on the 2nd of November, 1874, is in many respects confessedly inaccurate, and wholly inconsistent with the conceded facts of the case. It is apparent that both he and *Mr. Dawson* must have misunderstood, in many important particulars, what the appellee then stated, and their testimony, apart

from the memorandum, only goes to prove an *admission* or *confession* by the appellee that she knew Randall was alive after she married Le Brun.   Such also in the main, is the result of the testimony of *Mrs. Ashcroft* and her daughter, of *Miss Powers* and of *Joseph H. Le Brun*, a son of the complainant.   The appellee denies that she ever made such admissions or confessions, but assuming that she did, we must apply to them, and to all testimony of like character, what was said by the Supreme Court in *Gaines vs. Relf*, that it would be an alarming doctrine to hold that an actual ceremonial marriage could be made void by the mere confession or declaration of one of the parties to it that he had another wife living at the time. The rule adopted as a guard against imposition and the danger of a marriage being set aside by collusion between the parties, precludes us from placing reliance upon such testimony, especially in a case where the fact that Randall was alive at the time, if indeed it was a fact as the bill charges, could, by the use of proper and reasonable diligence, have been established by direct and conclusive proof.   *Mr. Dawson* further testifies to the effect, that after her bill for divorce was filed by the appellee, Le Brun informed him that Randall was living, and was a seaman in the United States Naval service, but where stationed he could not tell, and that witness thereupon, with a view of procuring his testimony, wrote a letter to Randall, and sent it to the Navy Department at Washington, with a request that it should be forwarded to him at whatever station he might be ;  that several weeks thereafter he received a reply, purporting to come from Randall, on board the United States ship "Independence," stationed at San Francisco, and that in this letter Randall expressed his indignation that his wife should attempt to contract a second marriage while he was living and contributing to her support.   But to the admissibility of all this, the appellee has filed an exception, which must unquestion-

ably be sustained, and the testimony excluded from the case. The letter itself, purporting to be from Randall, is not produced, nor is it proven to have been lost or destroyed, nor is its absence otherwise satisfactorily accounted for. *Mr. Dawson* says he gave the letter to the complainant after the divorce suit had been settled, but the complainant was not examined as a witness in the case for the purpose of proving what became of this letter, nor indeed for any other purpose.

But the strongest piece of evidence in support of the bill, is the letter of the 13th of April, 1874, already referred to. That letter purports to be from Charles Randall on board "United States Receiving Ship, Independence, Navy Yard, Mare Island, California," and is addressed to his daughter, "Miss Isabel Randall, Eastern Avenue, Baltimore." In her testimony the appellee admits that this letter was advertised in the papers, that she went to the Post Office, got it, and delivered it to her daughter who read it; but she says she did not believe it came from her first husband, because she believed him to be dead, had never heard from since 1857, and had, in 1862 or 1863, read in the newspapers that Charles Randall of Baltimore, was killed in an engagement up the Mississippi river with one of the rebel gunboats. The daughter testifies that she received the letter and read it, but regarded it of such little importance that she paid no attention to it, as she always supposed that her father was dead, and had been so informed by her mother. There is certainly in the letter itself intrinsic evidence that the writer had obtained some information of family matters which Randall would be likely to know. Among other things the daughter is informed by it, that her father had just ascertained her address, and hopes she will write to him as soon as she receives this letter; that for his having staid away from home so long he says her mother is entirely to blame, and it further says,

"Please give my respects to Mrs. Robinson, your aunt, and tell her that I am in good health." The Mrs. Robinson referred to was the aunt of the daughter who died fourteen years before. But it is conceded the letter was not in fact written by Charles Randall himself, and if written by another at his request and dictation, no effort has been made to prove or discover who the writer was, or from whom he obtained the information it contains. It appears in the record without the envelope showing from whence it came. It was discovered and taken possession of by the complainant's son, the witness in this case, who showed it to his father while the divorce suit was pending, and yet it was not used in the prosecution of his cross-bill in that case, nor, so far as the record discloses, was any thing done or attempted towards verifying its genuineness and authenticity, or establishing the identity of the party who dictated it with the appellee's first husband. In our opinion this letter thus produced, without other proof that the party writing or dictating it was in fact the woman's first husband, ought not to be made the foundation of a decree annulling her second marriage, and bastardizing the issue of that marriage. The surgeon's certificate received from the Navy Department, assuming it to be admissible in evidence, tends, as it seems to us, to weaken rather than strengthen the appellant's case. If admissible at all we must receive it as it stands, and take it for what it says. From this certificate it appears that Charles *Randalls*, "who was a landsman in the United States Navy attached to the United States Receiving Ship, Independence, at Mare Island, California," died on the 9th of June, 1877, and that he "entered the United States Naval Service at Mare Island, California, on the 8th day of June, in the year 1877." The difference in the name, the fact that he was enlisted and described as a *landsman*, and that he entered the service on the 8th of June, 1877, are all facts strongly tending to show that

this man could not have been the Charles Randall, who married the appellee in 1849, and who was then, and for all the years afterwards, so far as he can be traced by the undisputed proof in the case, continued to be a *seaman* and a *sailor*.

We are all very clearly of opinion a case for annulling the marriage has not been made out by the requisite proof, and this dispenses with the necessity of considering the question whether the failure of the complainant to prosecute his cross-bill in the divorce proceedings, and the decree dismissing that bill, constitute a bar to the maintenance of his present suit.

*Decree affirmed.*