REVA SAMUELSON *v.* ISADORE SAMUELSON.

[No. 23, April Term, 1928.]

*Decided May 25th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William Curran* and *Stanley K. Harman,* with whom were *A. Herman Siskind* and *Malcolm J. Coan* on the brief, for the appellant.

*Isaac Lobe Straus,* with whom were *Herman Samuelson* and *Morton M. Robinson* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The complainant in a bill in equity for annulment of a marriage appeals from the refusal of the relief, and a decree

dismissing her bill. The contention of the complainant was that the marriage, although valid in form, and solemnized by her full, free consent before a minister of the Christian religion, was entered into subject to an agreement of the parties that it should be without effect unless they should subsequently have a second ceremony before a Hebrew rabbi, and the defendant denied this. And the questions raised are first, that of the fact, and second, that of law—whether parties can enter into a marriage subject to such an agreement. The question of law is a serious one; courts which have had to consider it have held that parties to a marriage contract lawfully and completely solemnized cannot modify its effect, postpone its consummation, or lessen its obligations, by private agreements between themselves. *Mirizio v. Mirizio,* 242 N. Y. 74; *Hills v. State,* 61 Neb. 589. There is, at least, much force in the answer of the Nebraska court that, if such a nullifying agreement is to receive the sanction of the courts, then marriage can be dissolved by the parties themselves, and all that would be necessary to dissolve it would be, not a decree of court, but a simple agreement prior to the ceremony that it should not be binding on either party. "Neither public policy nor public conscience," that court concluded, "could suffer such a doctrine to live." But it is a question which need not be answered in this case, because, in our opinion, the complainant has failed to prove that there was such an agreement or private reservation.

The parties were young friends, both Hebrews, and in 1924, before the marriage, had developed an affection for each other, and become especially close companions, although the relationship was interrupted somewhat. She was born in February, 1907, he some few years earlier. In May of 1925 she made a visit of ten days in Virginia, and seems to have distressed him by doing so, although she wrote him a series of affectionate letters. And her going was the cause of a partial suspension of the relation between the parties during the succeeding summer. She spent July and August at a girls' camp. They met again in October, and on the day after their meeting drove together to Alexandria, Vir-

ginia, to be married. The young man went into the court house, there to obtain a marriage license, while she waited, but found that without the consent of the parents it could not be obtained for a girl under twenty-one years of age; and that effort to marry failed. A week of resumed, close relationship followed, and at the end of that time the couple drove to Ellicott City, in Howard County, obtained the necessary marriage license at the court house, then stopped at the house of a Christian minister to whom they were directed in response to their inquiries, and were married in due, legal form. A wedding ring was used, and the complainant after the ceremony hung it around her neck, on a ribbon, and wore it there, concealed under her dress. It was agreed that the marriage should be kept secret for some time and some money was paid to have knowledge of it withheld from the newspapers. And the wife returned to the home of her parents. The marriage was never otherwise consummated. At about the end of November, there was a controversy over her going out in the company of another young man against the defendant's objection, and this brought an exposure of the marriage. The young woman shortly after declared that "all was off," and the present suit for annulment was filed.

The complainant testified that she understood the marriage ceremony was nothing more than a formal betrothal. That idea, she first said, was one which originated in her own mind, and later, acquiescing in leading questions, she said the defendant induced her to enter into the marriage upon the assurance that it would amount only to a betrothal, and that if they tired of the marriage they could end it by merely tearing the license up. If, on the other hand, she said, they should decide to continue the relation, they would, according to the defendant's plan and promise, be married by a rabbi. The defendant denied these statements, asserted that there was no such agreement, that the idea of keeping the marriage secret was largely, on his side, based upon an unsettled condition of his business and his earnings, and that the only suggestion of marriage by a rabbi came at the time of the exposure of the earlier ceremony, and

was one looking only to the satisfaction of the Hebrew parents on both sides.

From the testimony reproduced in the record, this court has been unable to find the existence of a private agreement qualifying the effect of the marriage as the complainant says. It seems to us, at the outset, improbable that a young woman, over eighteen years of age, could make two such expeditions into nearby jurisdictions, stop at court houses to procure marriage licenses, finally go through a solemn marriage ceremony, receive a wedding ring, and wear it thenceforth constantly, with any idea that she was merely going through a betrothal ceremony. We are satisfied she knew she was being solemnly married. In parts of her testimony she speaks of the minister's marrying them. And it does not seem likely that she would join in the effort this couple made, and go through the ceremony they did go through, supposing there would be no binding effect in it, that there would still have to be a marriage ceremony to render the parties man and wife, and that at the will of either what was being done then could be nullified by tearing up the license. According to the previous agreement described by the complainant, a Christian minister or justice of the peace would have been sought out to celebrate the marriage, but apparently there was no such deliberate choice. The parties seem to have sought out merely the most convenient minister, and it appears to have been by accident rather than by plan or agreement that a rabbi did not celebrate the marriage at that time. Furthermore, the husband's testimony to the contrary seems straightforward, and the trial judge, who was persuaded of its truth, had both the parties before him, and could better estimate the value of the testimony of each.

On the whole the case seems to be one, not of an uncompleted, qualified marriage, but of marriage taken more lightly than the law permits, and now repented. During the course of the taking of testimony the trial judge felt called upon to rebuke the parties for treating the matter too lightly in court. It is not to be expected that this will be

the last instance of hasty, impulsive marriage, but the recurrence of such things seems to render it none the less necessary for the law to insist that marriages shall stand and not be nullified except with caution, and only upon clear, satisfactory proof of recognized grounds of nullification. The courts are not authorized to annul them merely because it may seem well for the particular parties before them. *Le-Brun v. LeBrun,* 55 Md. 496; *Wimbrough v. Wimbrough,* 125 Md. 619; *Feehley v. Feehley,* 129 Md. 565; *Oswald v. Oswald,* 146 Md. 314.

*Decree affirmed, with costs to the appellee.*