RALPH A. PICARELLA, ETC. ET AL. v.
SANDRA RHEY PICARELLA

[No. 601, September Term, 1973.]

*Decided March 15, 1974.*

500

The cause was argued before ORTH, C. J., and POWERS and DAVIDSON, JJ.

*Thomas L. Beight* for appellant.

*John W. Debelius* for appellee.

ORTH, C. J., delivered the opinion of the Court.

This case comes to us in an unusual appellate posture. It seems that both parties to the cause desire the same result — the annulment of their marriage.[1] The law does not permit their wish to be granted.

On 18 July 1973, RALPH A. PICARELLA, JR., a minor, by his mother and next friend, Claire Picarella, filed a bill of complaint in the Circuit Court for Montgomery County against SANDRA RHEY PICARELLA, formerly Sandra Rhey Graham, praying that the marriage entered into by them "be annulled and declared void and of no legal force and effect," that Sandra be restored to her maiden name, and that the costs be assessed against Ralph.[2] Sandra answered the bill, admitting the allegations therein, and praying the same relief. The case came on for hearing before the Domestic Relations Master as uncontested on all issues. The Master heard testimony and argument and filed his report, all pursuant to Rule S 74 of the Sixth Judicial Circuit of Maryland. He recommended, on his findings of fact and the provisions of Code, Art. 62, § 9 (b), that relief be granted

---

[1]. Appellee did not file a brief but appeared before this Court in oral argument through her counsel See Maryland Rule 1030 e.

[2]. "A court of equity has jurisdiction in an action for * * * annulment of marriage." Courts and Judicial Proceedings Article, (Courts Art.) § 3-603, formerly Code, Art. 16, § 22. As to venue, see Courts Art. §§ 6-201 and 6-202.

as prayed by the parties. The court below did not accept the Master's recommendation. On 7 September 1973 it entered an order denying the "Bill of Complaint for Annulment of Marriage." Ralph noted a timely appeal. Courts Art. §§ 12-301 and 12-308 (a) (13).

I

A stenographic transcript of the hearing before the Master was filed in the proceedings. Sixth Judicial Circuit Rule, S74 c 3. The evidence adduced through the testimony of Ralph and his mother and Sandra and her mother, and through three documents — the marriage license, Ralph's baptismal certificate and the certificate of Ralph's birth — was correctly reflected in the factual findings of the Master, which were not disputed. The Master found:

"Both parties are residents of the State of Maryland, they were married July 16, 1973, in Frederick, Maryland, and no children have been born, conceived nor adopted during their marriage.

At the time of the marriage of the parties, [Ralph] was 16-1/2 years of age and [Sandra] was 18 years of age. [Ralph] testified that he orally misrepresented his age as 18 years and altered the date of his birth on his birth certificate at the time application was made for the marriage license of the parties because he had not received the consent of either of his parents to marry. After the parties married, they cohabited on one occasion in the home of [Sandra's] parents and thereafter [Ralph] returned to the home of his parents where he has continued to live apart from [Sandra] under separate roof continuously without interruption or cohabitation, while [Sandra] still resides in the home of her parents. The Bill of Complaint in this suit was filed July 18, 1973, two days after the marriage of the parties.

[Sandra] testified she is certain she is not now pregnant, she has menstruated since the parties

cohabited, and she desires to resume her maiden name, Sandra Rhey Graham.

The testimony of the parties was duly corroborated by both of their mothers, and there is no hope or expectation of a reconciliation."

## II

Ralph contends that the marriage was "absolutely void *ab initio.*" He relies on Code, Art. 62, § 9 (a), which, as amended by Acts 1973, ch. 651, § 29, effective 1 July 1973, provides:

"A male over the age of 16 years and under the age of 18 years, or a female over the age of 16 years and under the age of 18 years, may marry, with the consent of the parent or guardian, if the parent or guardian swears or affirms that the child or ward is over the age of 16 years. A male over the age of 16 years or a female over the age of 16 years may marry without parental or guardian's consent, where required, upon presenting a certificate from a licensed physician stating that he has examined the female and positively ascertained that she is pregnant or has given birth to a child." [3]

---

**3.** Prior to the amendment § 9 (a) began: "A male over the age of 18 years and under the age of 21 years * * *."

The Master, in making his recommendations, relied on the provisions of Code, Art. 62, § 9 (b), and the Chancellor in deciding the case referred to it. That subsection was also amended by Acts 1973, ch. 651, § 29, effective 1 July 1973, to read:

"A male under the age of 16 years or a female under the age of 16 years may not marry except as allowed by this paragraph. Such a marriage shall be made only with the consent of the parent or guardian of the male under 16 years and/or the female under 16 years, as the case may be, upon the presentation of a certificate from a licensed physician stating that he has examined the female and positively ascertained that she is pregnant or has given birth to a child."

Prior to the amendment, § 9 (b) began: "A male under the age of 18 years * * *." As amended, it concerned only "minors", male and female, under the age of 16 years. The marriage took place on 16 July 1973, after the effective date of the amendment, at which time Ralph and Sandra were each over the age of 16 years. Thus, the marriage of Ralph and Sandra was not within the ambit of Code, Art. 62, § 9 (b).

Although the point that the marriage was void was not tried and decided

Sandra, being over the age of 18 years, was without the provisions of the statute. Ralph, being over the age of 16 years and under the age of 18 years, was squarely within its ambit. For him to marry in compliance with the statute, his parent had both to consent to the marriage and swear that he was over the age of 16 years, unless he presented a certificate from a licensed physician stating that the physician had examined Sandra and positively ascertained that she was pregnant or had given birth to a child. It is clear, as the Master found, that neither of Ralph's parents consented to the marriage, that no such certificate was presented and that the marriage license was procured upon Ralph's false statement as to his age, and alteration of his birth certificate, all of which was known to Sandra. This made Ralph, certainly, and Sandra, probably, subject to prosecution for committing a misdemeanor, Code, Art. 62, § 11 (a), and for perjury, § 11 (b). And see *State v. Floto*, 81 Md. 600. But, the matter of criminal penalties to which they might be subject, is not before us. The question is what effect did the violation of the provisions of Code, Art. 62, § 9 (a) have on the validity of the marriage.[4]

## III

"It is well known that marriage, while from its very nature a sacred obligation, is nevertheless a civil contract and is regulated by law." *Hopkins v. State*, 193 Md. 489, 496. "While marriage is a civil contract, it is, as said by *Story, Conflict of Laws*, paragraph 108n., 'something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent and contract of the parties, and in this view it has some peculiarities in its nature, character, operation and extent of obligation, different from what belong to ordinary contracts.' " *Oswald*

---

below in terms of Code, Art. 62, § 9 (a), but was erroneously presented to the lower court in terms of § 9 (b), we think it both necessary and desirable to decide the point under § 9 (a) as now presented to us, as Maryland Rule 1085 permits us to do.

4. There is no suggestion of non-compliance on the part of the authorities with the provisions of the law regarding the marriage license and the solemnizing of the marriage. See Code, Art. 62, §§ 3A-8, 12-19.

*v. Oswald*, 146 Md. 313, 315. "Undoubtedly in the eye of the law marriage is a civil contract differing from other contracts in the circumstances that it cannot be rescinded by the mere consent of the parties." *Ridgely v. Ridgely*, 79 Md. 298, 307.

The general rule is that "* * * marriages shall stand and not be nullified except with caution, and only upon clear, satisfactory proof of recognized grounds of nullification. The courts are not authorized to annul them merely because it may seem well for the particular parties before them." *Samuelson v. Samuelson*, 155 Md. 639, 643.[5] See *Le Brun v. Le Brun*, 55 Md. 496, 503. "In contracts of marriage there is an interest involved above and beyond that of the immediate parties. Public policy requires that marriage should not be lightly set aside." *Oswald v. Oswald, supra*, at 315. It was neatly summed up in *Behr v. Behr*, 181 Md. 422, 426:

> "While marriage is a civil contract and not a sacrament, the law regards it with a sanctity which is not attributed to any other kind of contract; on the theory that the public has a direct interest in it as an institution of transcendent importance to social welfare. *Fornshill v. Murray*, 1 Bland 479, 18 Am. Dec. 344; *Denison v. Denison*, 35 Md. 361; *Le Brun v. Le Brun*, 55 Md. 496; *Ridgely v. Ridgely*, 79 Md. 298, 29 A. 597, 25 L.R.A. 800; *Twigg v. Twigg*, 107 Md. 676, 69 A. 517; *Wimbrough v. Wimbrough*, 125 Md. 619, 94 A. 168. Moreover, in Maryland the marriage contract is required to be solemnized by a religious ceremony *(Denison v. Denison, supra)*,

---

5. In *Samuelson*, by way of *obiter dictum*, the Court indicated that parties to a marriage contract lawfully and completely solemnized cannot modify its effect, postpone its consummation, or lessen its obligations, by private agreements among themselves. It found much force in the view that "if such a nullifying agreement is to receive the sanction of the courts, then marriage can be dissolved by the parties themselves, and all that would be necessary to dissolve it would be, not a decree of court, but a simple agreement prior to the ceremony that it should not be binding on either party. 'Neither public policy nor public conscience * * * could suffer such a doctrine to live'." 155 Md., at 640, quoting *Hills v. State*, 61 Neb. 589. The Court in *Samuelson*, however, found no need to answer the question because no agreement or private reservation was sufficiently proved.

and will not be dissolved or annulled by the courts except for the soundest of reasons and upon the strictest of proof. *Le Brun v. Le Brun, supra.*"

"[T]he power of a court of equity to declare a marriage null and void, when a proper case is made out, cannot be questioned." *Le Brun v. Le Brun, supra,* at 502. The authority of the court in such cases derives from the inherent powers of the court, exclusive of any statutory provision.[6] This authority is with respect to marriages procured by fraud or duress. "The inherent power of the

---

**6.** Such power is exclusive of the *a vinculo* divorce statute, Code, Art. 16, § 24, and Maryland Rule S76. The statute, however, has two grounds which actually involve granting, in the name of divorce, what are substantially annulments, namely impotence of either party at the time of the marriage, and for any cause, which by the laws of this State, render a marriage null and void *ab initio.* There was a third prevenient ground, the pre-marital unchastity of the wife, but this was deleted by Acts 1939, ch. 558. See *Behr v. Behr, supra,* at 426. The unfortunate situation of bastardizing, *nunc pro tunc,* the offspring, which would be the result of avoiding a voidable marriage, was ameliorated by legislative enactment. Acts 1949, ch. 29, as amended by Acts 1950, ch. 33, and codified as Art. 16, § 27, provides:

> "This section shall apply whenever any criminal or equity court of this State has for any reason annulled a marriage, and declared it to be null and void, or whenever any equity court of this State has decreed a divorce a vinculo matrimonii for any cause which by the laws of this State render a marriage null and void ab initio. In such case the issue of such a marriage shall be deemed and declared to be the legitimate issue of the parents thereof."

The reference to a criminal court annulling a marriage concerns Rule S76, which reads:

> "When a court shall convict one or both of the spouses of bigamy, of marrying within any prohibited degree, or of marrying between races prohibited by law to intermarry, the judgment of conviction shall serve as an annulment of the unlawful marriage, provided that there shall be recorded at the instance of any interested person on the records of a court of equity of the same county, a complete transcript of the docket entries in the criminal proceedings leading to said judgment of conviction."

This was formerly Code, Art. 62, § 16, which was repealed by Acts 1962, ch. 36, § 1. For the early history of this statute, see *Ridgely v. Ridgely, supra.* The Court of Appeals has constitutional power to make rules which have the force of law until rescinded, changed or modified by the Court or otherwise by law. *Constitution of Maryland,* Art. IV, §§ 18 and 18 A. They are legislative in nature. *Ginnavan v. Silverstone,* 246 Md. 500. See *County Fed. Sav. & Loan Ass'n. v. Equitable Sav. & Loan Ass'n.,* 261 Md. 246; *Funger v. Mayor & Council,* 244 Md. 141; *Hill v. State,* 218 Md. 120.

courts of equity to declare a marriage void when procured by fraud or duress has long been recognized in Maryland." *Townsend v. Morgan,* 192 Md. 168, 174. The Court in *Le Brun v. Le Brun, supra,* put it thus, at 503: "If the marriage be procured by abduction, terror, fraud, or duress, the court, in declaring it a nullity, acts in virtue of its general jurisdiction in matters of fraud affecting contracts * * *." *Ridgely v. Ridgely, supra,* added a proviso. Observing, at 307, the status in the eye of the law of marriage as a civil contract, it said: "Being then a contract, it seems to follow that where it has been procured by fraud or duress, it may be set aside by a court whose inherent jurisdiction gives it authority to annul any ordinary contract procured in the same way; provided the application be promptly made and before a consummation of the marriage by voluntary cohabitation." *Oswald v. Oswald, supra,* at 316, apparently expanded the nature of the fraud: "A marriage may be annulled by a court of equity in this State when it is procured by abduction, terror, fraud or duress, or when the fraud complained of relates to essential matters affecting the health or well being of the parties themselves." *Oswald* pointed out that the difficulty is in determining when the representations made or the acts charged amount to fraud which may authorize the courts to decree the annulment, and illustrated that view by discussing a number of cases. We find it clear, however, from *Oswald* and from the cases decided before and after it, that for the court to decree annulment because of fraud, the representations made or the acts charged must not only amount to fraud but must be such as induced the other party to enter into the contract or be such as relate to essential matters affecting the health or well being of the parties themselves.[7] The acts of Ralph in making a false statement to the licensing authorities as to his age and in altering his birth certificate was patently not

---

7. Upon proper proof, it seems that annulments may be granted for lack of contractual intention, *Brooke v. Brooke,* 60 Md. 524, insanity, *Elfont v. Elfont,* 161 Md. 458, and intoxication, *Montgomery v. U'Nertle,* 143 Md. 200, but apparently these were deemed a form of fraud or duress. *Corder v. Corder,* 141 Md. 114.

such fraudulent conduct under the decisions as to authorize the equity court to decree an annulment.[8]

The conduct of Ralph not being sufficient under prior judicial decisions to constitute such fraud as would authorize an annulment of the marriage, the question is whether Code, Art. 62, § 9 (a), mandates an annulment. That is, whether the statute goes to the validity of the marriages in violation of it, and is so, does it make them totally void or only voidable.[9]

---

8. "In general, either party may complain, but obviously in this as in other instances, the party guilty of the fraud cannot allege and rely on his own misconduct to avoid a contract procured by that means." *Ridgely v. Ridgely, supra,* at 307-308. The Court expounded on this in *Townsend v. Morgan, supra,* at 175-176:

"It is generally accepted that the equitable maxim that he who comes into equity must come with clean hands cannot be applied in any case where the result of the application sustains a relation which is denounced by statute or is contrary to public policy * * * In proceedings to annul a bigamous marriage, the interest of the State is paramount to the grievances of the parties directly interested. The State sponsors the sanctity of the marriage relation and the welfare of society. In some cases the interest of unborn children may be affected. There is a difference between the ordinary case where the court refuses to aid the complainant in securing benefits from his own wrongdoing and the case where the complainant desires to have a judicial declaration that a marriage is null and void. When a party files a suit for annulment of his marriage, he is deemed as coming into court repenting of his wrongdoing and asking the court to correct his wrongful act as far as possible, in order to prevent any injurious consequences which might be cast thereby in the future upon innocent persons and upon the State. For these reasons the unclean hands doctrine is not applicable in a suit to annul a bigamous marriage. The marriage status being on a different footing from contracts generally, a party may be relieved from a void marriage, although fully aware of its invalidity when contracted. * * *

It is an unquestioned principle that a court of equity will refuse aid to a complainant who has acted fraudulently or gained an advantage by deceit or unfair means. But the general iniquitous conduct, unconnected with the transaction alleged as the cause of action, does not deprive him of his right to relief in a court of equity. Equity does not demand that suitors shall have led blameless lives. The maxim requiring clean hands does not disqualify one who has not dealt unjustly in the particular matter in which judicial protection or redress is sought. The courts apply the maxim only where some unjust act of the complainant affects the equitable relations of the parties with respect to the matter presented for adjudication. Thus the maxim is applied, not by way of punishment for past violations of the law, but upon considerations that make for justice." (Citations omitted)

9. "Totally void" means that the marriage possesses some defect rendering it subject to both direct and collateral attack. For such marriages

508

## IV

At the common law, from whence stemmed the Maryland rule of the marriage status, marriage was considered in no other light than a civil contract.[10] Commenting on the ability to marry, Blackstone said, id. at § 436, that a legal disability was want of age. "This is sufficient to avoid all other contracts, on account of the imbecility of judgment in the parties contracting; *a fortiori* therefore it ought to avoid this, the most important contract of any." By the common law rule, if one of the parties was under the age of 7, the marriage was totally void; if the male was over the age of 14 and the female over the age of 12, the marriage was completely valid; if the male was between 7 and 14 or the female between 7 and 12, the marriage was voidable by either, and subject to ratification when the under-age spouse reached 12 or 14 as the case might be.[11] There being no decision of the appellate courts of this State directly on the impediment of non-age,[12] and there being no Maryland statute definitely changing the common law, unless the statute here considered be deemed to be mandatory, the common law rule prevails. If the statute is not mandatory, as both Ralph and Sandra were over the common law age of

no direct step or proceeding to annul is necessary but may be desirable. "Voidable" expresses the idea that the defect, at most, subjects the marriage to direct attack under appropriate procedure during the joint lives of the parties. See Strahorn, *Void and Voidable Marriages in Maryland and Their Annulment*, 2 Md. L. Rev. 211 (1938); *Comment: A Query About the New Marriage Age Law*, 3 Md. L. Rev. 340 (1939).

10. Blackstone, in his Commentaries, Book I, ch. XV, § 433 (Lewis's Ed.), inquiring how marriage may be contracted or made, said: "Our law considers marriage in no other light than as a civil contract. The *holiness* of the matrimonial state is left entirely to the ecclesiastical law: the temporal courts not having jurisdiction to consider unlawful marriage as a sin, but merely as civil inconvenience. * * * And, taking it in this civil light, the law treats it as it does all other contracts: allowing it to be good and valid in all cases, where the parties at the time of making it were, in the first place, *willing* to contract; secondly, *able* to contract; and, lastly, actually *did* contract, in the proper forms and solemnities required by law."

11. On the common law rule, see Long, *Domestic Relations*, Second Edition, § 23. See also dicta in the dissenting opinion in *Lurz v. Lurz*, 170 Md. 428, 436-439, noted, 1 Md. L. Rev. 348, 353-354 (1937).

12. For a dictum on the ratification of infant marriages, with no mention of the appropriate ages, see *Jones v. Jones*, 36 Md. 447, 456. See also Lawrence, *Law of Divorce and Annulment of Marriages in Maryland*, pp. 46-47 (1939).

consent, age presented no impediment to their marriage, and it could not be avoided for non-age.

As we have indicated, at the common law, if the parties themselves were of the age of consent, "there wanted no other concurrence to make the marriage valid: and this was agreeable to the canon law." Blackstone, § 437. There were, however, English statutes requiring parental consent in certain circumstances,[13] and it may well be that our statutory enactment on the subject was inspired by the English laws.

The legislative history of Code, Art. 62, § 9 (a) is germane to the consideration of its effect on marriages made in violation of it. Acts 1886, ch. 497, § 7 provided that no marriage license shall issue "unless the male be above the age of twenty-one years, and the female above the age of sixteen years; provided, however, that if the parents or guardian assent thereto in person, or by writing, attested by two witnesses, such license may issue, and the fact of such

---

13. 26 Geo. II. c. 33, as amended, by 4 Geo. IV. c. 76, provided "that the father, if living, of a party under twenty-one years of age, such party not being a widower or widow; or if the father be dead, the guardian of the person under age lawfully appointed; or in case of no guardian, then the mother of such party, if unmarried; or if there be no mother unmarried, then the guardian of the person appointed by the court of chancery, if any, shall have authority to give consent to the marriage; and such consent is thereby required for the marriage, unless there be no person authorized to give such consent."

Blackstone commented, § 438:

"Much may be, and much has been, said both for and against this innovation upon our ancient laws and constitution. On the one hand, it prevents the clandestine marriages of minors, which are often a terrible inconvenience to those private families wherein they happen. On the other hand, restraints upon marriages, especially among the lower class, are evidently detrimental to the public, by hindering the increase of the people; and to religion and morality, by encouraging licentiousness and debauchery among the single of both sexes; and thereby destroying one end of society and government, which is *concubitu prohibere vago*. And of this last inconvenience the Roman laws were so sensible, that at the same time that they forbade marriage without the consent of parents or guardians, they were less rigorous upon that very account with regard to other restraints: for, if a parent did not provide a husband for his daughter, by the time she arrived at the age of twenty-five, and she afterwards made a slip in her conduct, he was not allowed to disinherit her upon that account: '*quia non sua culpa, sed parentum, id commisisse cognoscitur.*' "

assent shall be made part of the record aforesaid." Acts 1920, ch. 549, raised the age of the female to above 18 years. Acts 1939, ch. 728, repealed the former law and re-enacted it with amendments. The language used was more stringent. Rather than merely prohibiting the issuance of a license, a crime was created:

"It shall be unlawful within this State for any female below the age of sixteen years or any male below the age of eighteen years to marry, or for a parent to permit any such female or male to marry, except on the certificate of a licensed physician, which shall be presented with the application for the marriage license, to the effect that the girl is pregnant, or for any female between the ages of 16 and 18 years, or for any male under the age of twenty-one years, to marry unless the parent or guardian of such male or female, in person or by signed affidavit, assent thereto, and, in the case of a female, swear or affirm that she is over the age of sixteen years, and in the case of a male, swear or affirm that he is over the age of eighteen years."

When either of the contracting parties was known to be within the provisions of the statute, it was the duty of the Clerk before issuing a license and of any minister before performing the ceremony to demand the assent and statement required, and make it a part of the record. Any person violating the statute was guilty of a misdemeanor and subject to a fine of not more than $250. Any person knowingly making any false statement to procure a marriage license or marriage ceremony was guilty of perjury. Acts 1947, ch. 105, amended the statute in regard to the necessary consent:

"It shall be unlawful within the State for any female below the age of sixteen years or any male below the age of eighteen years to marry, or for a parent or guardian to permit any such female or male to marry, or for any female between the ages of sixteen and eighteen years, or for any male

under the age of twenty-one years to marry, unless the parent or guardian of such male or female, in person or by signed affidavit, assent thereto, and, in the case of a female, swear or affirm that she is over the age of sixteen years, and, in the case of a male, swear or affirm that he is over the age of eighteen years. Provided, however, that on the certificate of a licensed physician, presented with the application for a marriage license, to the effect that the girl is pregnant or has given birth to a child, a marriage license may be issued without the consent of her parent or guardian, and if the putative father of the child or prospective child of a girl under eighteen years of age is over sixteen years of age, a marriage license may be issued without the consent of his parents or guardian."

Acts 1951, ch. 6, made changes only regarding the sealing of the records. Acts 1967, ch. 573, repealed the former statute, by then codified as Art. 62, § 9 (a), and re-enacted it with significant changes. The statute was divided into subsection (a) and subsection (b). Subsection (a) concerned males over 18 years and females over 16. It provided:

"A male over the age of 18 years and under the age of 21 years, or a female over the age of 16 years and under the age of 18 years, may marry, with the consent of the parent or guardian, if the parent or guardian swears or affirms that the child or ward is over the age of 18 years or 16 years, as the case may be. A male over the age of 18 years or a female over the age of 16 years may marry without parental or guardian's consent, where required, upon presenting a certificate from a licensed physician stating that he has examined the female and positively ascertained that she is pregnant or has given birth to a child."

Its prescriptions were couched in the affirmative. It authorized a marriage of those within the designated ages with parental consent or upon the physician's certificate. On

the other hand, subsection (b), dealing with males under 18 and females under 16, proscribed a marriage of those under the designated ages, declared "Such a marriage shall be made only" with parental consent or upon the physician's certificate. It was still a misdemeanor to violate the provisions of the sections and perjury to make a material false statement to procure a marriage license or ceremony. Acts 1973, ch. 651, as we have indicated *supra*, changed the ages in subsection (a) of both the male and the female to "over the age of 16 years and under the age of 18 years" and in subsection (b) to "under the age of 16 years." [14]

We find it established in this State that the statutory licensing provisions are directory and not mandatory, so that a marriage performed without a license is nevertheless valid. In *Feehley v. Feehley,* 129 Md. 565, the Court overruled a contention that failure to secure a license rendered the marriage void. It gave its reasons at length, at 568-571:

> "[T]here is no purpose expressed in the statute that a marriage otherwise validly contracted and celebrated shall be void if the prescribed license shall not have been procured. * * * On the contrary, there is an implied recognition of the efficacy of marriages solemnized without a license in the provision that a minister who shall 'marry' persons in the absence of such official authorization shall be subjected to the stated penalty. The requirement of a license preliminary to marriage is wholly of statutory origin. At common law, according to the decisions of this Court, a religious ceremony, in celebration of the civil contract, was sufficient to make the marriage lawful. * * * In view of the important considerations of morality and legitimacy involved, it is manifestly a sound and just rule of construction that statutes providing for marriage licenses are not held to have the effect of nullifying, for non-compliance with their terms, a

---

14. Acts 1968, ch. 384 made changes not here relevant in subsection (b).

marriage valid at common law, unless such an intention is plainly disclosed. This salutary principle has been applied in numerous decisions. There are differences of judicial opinion in various jurisdictions as to what are the essential features of a marriage under the rules of the common law, but the courts are generally in accord upon the proposition that a statutory provision for license to marry should not be regarded as mandatory, and vital to the validity of a marriage, in the absence of a clear indication of a legislative purpose that it should be so construed. * * *

The regulative purposes of the license statute are useful and important, but they are sought to be enforced by pecuniary penalties pronounced against those officiating at unlicensed marriages, and not by the radical process of rendering void and immoral a matrimonial union otherwise validly contracted and solemnized. In order to obviate such a result it has been decided by this Court that even the statutory provision expressly declaring void any marriage contracted within the prohibited degrees of relationship, did not have the effect of making absolutely void a marriage of uncle and niece, contrary to its terms, but rendered the marriage voidable only by judicial decree passed during the lifetime of the parties.[15] * * * The principle that such provisions are directory only, has been adopted in jurisdictions where a religious ceremony is not regarded as an essential element of a marriage according to the common law, and it would seem that in a State like our own, where this additional sanction and safeguard is required, there

---

**15.** Code, Art. 62, § 1, provides: "If any person within this State shall marry within any of the degrees of kindred or affinity expressed in the following table, the marriage shall be void." Acts 1973, ch. 213, added, as a first sentence: "Only a marriage between a man and a woman is valid in this State." The word "void" does not mean void *ipso facto*, or void *ab initio*. *Fensterwald v. Burk*, 129 Md. 131; *Dimpfel v. Wilson*, 107 Md. 329; *Harrison v. State ex rel. Harrison*, 22 Md. 468.

is even stronger reason for the rule that the validity of such a marriage should be sustained." (citations omitted) [16]

The result is that, while the licensing authorities, the parties, and the celebrant may be criminally liable and punished for marrying without a license, the marriage itself is as valid as if one had been procured. We find this to be the present law of this State.

A marriage without a license being valid, it follows, we believe, that a marriage under a license improperly procured is valid. The statutory provisions with regard to licensing being directory and not mandatory, the statutory provisions regarding age and parental consent are directory and not mandatory. We hold that the provisions of Code, Art. 62, § 9 (a) are directory.[17]

As the provisions of Code, Art. 62, § 9 (a) are directory only and do not go to the essential validity of a marriage, a marriage in violation of any provision of the statute, whether as to the age of the parties (if the male is over 14 years and the female over 12 years) or as to parental consent, is valid and neither void nor voidable.[18] The amendments of the statute from time to time, although changing the detail, and, perhaps, the emphasis, did not alter the basic import of the law. Whether the statute spoke in terms of no license being issued, or of it being unlawful to

---

**16.** This is the weight of opinion in other jurisdictions also. "If a statute prescribes formalities for the celebration of marriage, it is not to be construed as rendering an informal marriage invalid, unless it expressly so declares." Madden, *Persons and Domestic Relations* § 21 (1931). Long, *Domestic Relations,* 2d ed., § 63. When a religious ceremony was mandatory in Maryland, *Denison v. Denison,* 35 Md. 361 and *Fornshill v. Murray,* 1 B 1. 479, but see present Code, Art. 62, § 3A (a), even if the celebrant lacked appropriate authority, if the parties acted on the belief that he had it, the marriage was valid. *Knapp v. Knapp,* 149 Md. 263.

**17.** We reach no decision as to § 9 (b). No implication as to whether we think its provisions are directory or mandatory is to be taken from our failure to rule thereon. It is simply not before us.

**18.** Professor Strahorn, University of Maryland, School of Law, reached this conclusion in 1938, in *Void and Voidable Marriages in Maryland and Their Annulment,* 2 Md. L. Rev. 211, 223, and reaffirmed it in his Comment, *A Query About the New Marriage Age Law,* 3 Md. L. Rev. 340 (1939), and in his article, *Fifteen Years of Change in Maryland Marriage and Annulment Law and Domestic Relations Procedures,* 13 Md. L. Rev. 128 (1953).

marry except as designated, or, as now, of authorizing a marriage under stated conditions precedent, the effect of the proscriptions was only *in terrorem.* The statute never, from its original enactment, through its divers amendments, explicitly or implicitly declared a marriage in violation of its provisions void or voidable or other than valid.

Our view finds tacit support in *Corder v. Corder,* 141 Md. 114, where, although the parties were under the age then required by the statute and parental consent was lacking, an annulment was granted for fraudulent representation, not for non-age.[19] And also in *Montgomery v. U'Nertle, supra,* where both parties were under the age for parental consent, but no mention of the impediment was made, the annulment being granted for fraud and deceit on the basis of intoxication. "Obviously, if non-age alone were a sufficient ground for annulment, it would not have been necessary to have gone to such pains to spell out intoxication and fraud * * * on the conflicting facts of those cases." *Strahorn,* Comment, *A Query about the New Marriage Law,* 2 Md. L. Rev. 341, 342, note 12.

We find expressed support for our view in two cases in foreign jurisdictions construing the Maryland law. *Hitchens v. Hitchens,* 47 F. Supp. 73 (D.C.D.C., 1942), concerned the statute as amended in 1939. The court observed that the statute left "it uncertain as to whether marriages contracted in violation of such provision [age and parental consent] are void or voidable, on the one hand, or are valid with certain penalties attaching, on the other hand." At 75. The court thought that the marriage was valid and proper. "This is in accord with the general rule that unless the statute

---

19. The false representation was made to Susanna B. Corder, age 16 years, by Floyd Glen Corder, her father's chauffeur, about 20 years of age, both of Pennsylvania, that both were of an age at which they could legally obtain a license and be married in Maryland without the consent of their parents. It also appeared from the evidence "that the defendant [Floyd] was not of clean and good habits of life as represented by him to plaintiff [Susanna] prior to marriage, but on the contrary the evidence shows him to have been a man of loose and immoral habits, and of improper and irregular relations with dissolute women. The testimony also shows that he continued the same degraded habits of life after his marriage, and that he was a man without proper morals or decency." 141 Md. at 119.

expressly declares a marriage contracted without the necessary consent of the parents to be a nullity such statutes will be construed to be directory only so that the marriage contract itself will be valid although penalties may be imposed upon the parties." At 75-76. See cases cited in note 15 thereof, at 76. Pointing out that "at no place does the Maryland Code specifically declare that marriages contracted in violation of such provision are null and void or even voidable, it said, at 76:

> "It would appear reasonable to assume that had the legislature intended such a consequence the statute, since it was changed, would have so provided. Similarly, in reading the entire statute it is to be noted that the 'it shall be unlawful' provision is used in the same sentence both as applying to the parties to the marriage ceremony and to the parent or guardian conniving in the marriage of a party that is under the minimum age of consent. This lends weight to the suggestion that the statute may be construed properly as 'in terrorem' only, and that while the Maryland legislature has sought to discourage marriages in this age group without parental consent, a lack of such consent does not necessarily make the contracted marriage invalid."

A motion to dismiss the complaint seeking an annulment was sustained. In *Needam v. Needam,* 183 Va. 681, 33 S.E.2d, 288 (1945), the Supreme Court of Appeals of Virginia denied an annulment to a Virginia couple who went to Maryland and obtained a license without required parental consent. The parties were over the common law age of consent. The court referred to the general rule and concluded, 33 S.E.2d, at 291:

> "Marriages of minors over the age of consent for marriage are not 'supposed to be void' merely because of the lack of parental consent. The provision for parental consent is directory and preventive, rather than prohibitive, of the

consummation of the marriage contract. Minors over the age of consent for marriage have the capacity to enter into the marriage relation. Their marriage is a permissible status. It is not merely a contract between infants."

We find that the marriage of Ralph and Sandra was neither void nor voidable by reason of the wrongful procurement of the marriage license and the lack of parental consent. We hold that the marriage was valid.[20]

Like *Samuelson v. Samuelson, supra,* the case here seems to be one, not of uncompleted, qualified marriage, but of a marriage taken more lightly than the law permits, and now repented. What the Court said in *Samuelson* is here appropriate: "It is not to be expected that this will be the last instance of hasty, impulsive marriage, but the recurrence of such things seems to render it none the less necessary for the law to insist that marriages shall stand * * *." 155 Md., at 642-643. The court below was correct in not annulling the marriage merely because it may seem well for the particular parties before it.

> *Order of 7 September 1973*
> *denying annulment affirmed;*
> *costs to be paid by appellant.*

---

**20.** As the second contention of appellant is bottomed on the premise that the marriage was voidable, we do not reach it.